SKJOLDAL, Respondent v. MYREN et ux, Appellants

(191 N.W.2d 809)

(File Nos. 10899, 10918.  Opinion filed November 23, 1971)
Rehearing denied December 27, 1971

**Newell E. Krause, Lakeman & Krause,** Mobridge, for appellants.

**Ronald R. Johnson, Johnson & Kelley,** Lemmon, for respondent.

PER CURIAM.

In this suit against the defendants, Krohn Myren and Helen Myren, the plaintiff Malven Skjoldal, seeks specific performance of an alleged contract for the sale of real estate or, in the alternative, damages. The contract is claimed to be partly in writing and partly oral. The trial court denied specific performance but granted a money judgment for $9,000 against the defendant, Krohn Myren. It dismissed the action against the defendant, Helen Myren, with prejudice. The defendant Krohn Myren has appealed from the judgment against him. The plaintiff has cross appealed from the same judgment claiming he was entitled to judgment for a greater sum and the judgment should have been against both defendants.

Krohn Myren and Helen Myren are husband and wife and for some years before November 27, 1962, owned 160 acres of farmland in Perkins County, South Dakota, and 780 acres of farmland

in Sioux County, North Dakota. They also owned a home at Lemmon, South Dakota. Title was held by them as joint tenants with right of survivorship. Krohn Myren also owned a line of farm machinery. He had farmed the land in 1962 and prior years, but decided to quit and join his wife who was a lay minister and lived in Miles City, Montana.

Krohn Myren was interested in selling the farmland, house and machinery. He had fixed a price of $75 per acre for the farmland, $6,000 for the house and $6,500 for the machinery. The property was offered to various parties at these figures in the fall of 1962 including the plaintiff. Myren was unable to sell the property.

After some earlier discussions and negotiations Krohn Myren and plaintiff went to a banker at Lemmon on November 27, 1962 who prepared three separate written instruments each bearing that date. They are: (1) A crop share lease on the farmland for 1963 to expire on October 1, 1963. The landlord's share was 1/3 of all crops raised on the premises; the tenant's share, the remaining 2/3rds. The lease was signed by both of them. (2) A Bill of Sale for the farm machinery signed by Myren who had earlier been paid $6,500 as the consideration therefor. (3) An option to purchase in which the farmland and the house were specifically described. The option fixed a price of $75 per acre for the farmland and $6,000 for the house. Under terms and conditions it specified "on cash or crop payments as mutually agreed". The option began on December 1, 1962 and could be exercised at any time within 390 days thereafter by notice in writing. The option was signed by Krohn Myren and also by plaintiff who accepted it and agreed to each and all of its terms. The option expired on January 25, 1964, without being exercised on either the house or the farmland.

Plaintiff and his family moved into the house at Lemmon about January 1, 1963 and paid a rental of $50 per month. On April 3, 1964, plaintiff purchased the house and made a down payment of $300 on the purchase price. He also executed a mortgage on crops from the land securing the unpaid balance of

$5,700. Final payment for the house was made in 1965 and a deed of conveyance dated October 20, 1965 was delivered to the plaintiff.

Plaintiff farmed the land from 1964 through 1970 on the same crop share basis without a new lease being executed. See SD-CL 43-32-14. He testified at the end of each farm year Krohn Myren verbally extended the lease and the option to purchase he had executed on November 27, 1962. He also testified when he made the final payment for the house in the fall of 1965 Myren said he would take $10,000 as a down payment for the land, which plaintiff said was the amount he wanted when the land was originally offered for sale, and the balance in annual payments of $5,000, with interest at 6% per annum, which again he says was discussed as the interest rate at the time of the original offer.

In the fall of 1969 Myren informed plaintiff he intended to sell the land and that he wanted $15,000 per quarter section with a down payment of $15,000. Plaintiff called his attention to the earlier down payment figure of $10,000 and said he did not know if he would be interested in paying more than the price specified in the original option. The matter then rested until after the first of the year although there were telephone calls between the parties. On March 16, 1970, Krohn Myren called plaintiff and said he wanted a down payment of $15,000 and plaintiff said he wanted a week to see if he could raise that sum. The next day plaintiff went to Miles City where Myren lived and said he could raise $15,000 for the down payment. Myren then informed plaintiff he had decided to let his son-in-law have the land. However, if the son-in-law did not want it, plaintiff could still have it. Plaintiff made some effort to telephone the son-in-law, but could not reach him. The following day he contacted legal counsel and this action followed.

From the evidence which we have summarized, the trial court found as follows:

"III.

"The plaintiff and defendant Krohn Myren orally agreed at various times after the first 390 days that the

plaintiff's right to purchase the land was continuing. The plaintiff's continuing right to purchase the land was re-affirmed from time to time by the defendant Krohn Myren.

"IV.

"Sometime in 1965 after renting the house for a time, the plaintiff paid the defendant in full for the house at the originally agreed price and received a deed signed by each. During the time of closing of the house transaction the defendant Krohn Myren reaffirmed the right of plain-tiff to purchase the land described above and plaintiff suggested terms of $10,000.00 at the time of closing sale and balance in annual principal payments beginning one year after closing and continuing annually there-after in the amount of $5,000.00 with interest at 6%. The Court is unable to find beyond a doubt and by clear and convincing proof that the defendant Krohn Myren specifi-cally agreed to such payment schedule but does find by a preponderance of the evidence that the parties did at such time agree to such terms as acceptable in pursuance of the original agreement."

In allowing damages the court concluded a contract, partly oral and partly written, between Krohn Myren and plaintiff, to purchase the farmland for $75 per acre with a down payment of $15,000, and annual payments of $5,000 with 6% interest per annum had been established by satisfactory evidence. It also concluded part performance by plaintiff consisting of farming the land from 1963 through 1970, purchase of the house, and purchase of the farm machinery constituted sufficient part per-formance to remove the contract from the requirements of the statute of frauds. However, the court concluded the contract should not be specifically enforced for a conveyance of the one-half interest of Krohn Myren in the farmland, but plaintiff was entitled to $9,000 in damages for a breach of the contract to convey consisting of the difference between the contract price and the present value of Krohn Myren's one-half interest in the land.

In specific performance cases the contract with all its material terms and conditions must be proved by evidence so clear and satisfactory to the mind of the trial court as to leave no doubt of the agreement. Ward v. Melby, 82 S.D. 132, 142 N.W.2d 526; Crawford v. Carter, 74 S.D. 316, 52 N.W.2d 302. Relief should be cautiously granted and whether or not the proof in a case meets the required degree of persuasiveness is primarily for the trial court to determine. Ward v. Melby, supra.

An option to purchase real estate although initially unilateral when properly accepted becomes a binding contract and is capable of enforcement. Renner v. Crisman, 80 S.D. 532, 127 N.W.2d 717. Such is the rule although it has been said such arrangements generally are not favored by courts of equity. See 81 C.J.S. Specific Performance § 47a, p. 525, and cases cited in footnotes.

The first question we consider is whether the option granted plaintiff on November 27, 1962, and the oral extensions thereof, is void for uncertainty under the statute of frauds. SDCL 53-8-2 provides:

"The following contracts shall not be enforceable by action unless the same or some memorandum thereof be in writing and subscribed by the party to be charged or his agent, thereunto authorized in writing: * * *

(3) An agreement for the sale of real estate or an interest therein or lease of the same for a period longer than one year, but this does not abridge the power of any court to compel specific performance of any agreement for sale of real estate in case of part performance thereof."

The option fixed the terms as "on cash **or crop payments as mutually agreed".** (emphasis ours) This court has uniformly held where credit terms are not fixed or ascertainable from the instrument a court of equity will not grant specific performance. Johnson v. Plotner, 15 S.D. 154, 87 N.W. 926; Meyer Land Co. v. Pecor, 18 S.D. 466, 101 N.W. 39. Mere failure to state time of pay-

ment will not defeat specific performance where it can be ascertained from the agreement that the parties did not intend to defer payment of the purchase price. Boekelheide v. Snyder, 71 S.D. 470, 26 N.W.2d 74. Where the vendee has the privilege of paying the full purchase price in cash and tenders it failure to fix terms of credit are immaterial. Tennant v. Rafferty, 44 S.D. 235, 184 N.W. 195. In the case at bar, it is undisputed that plaintiff's tender, if in fact there was a tender, or his acceptance of the option, if in fact it was accepted, was not on the basis of paying for the land in cash.

Discussions and negotiations preceding the execution of the option cannot be utilized to supply a material defect. SDCL 53-8-5. The execution of the written option excluded all oral stipulations and negotiations concerning it which preceded or accompanied its execution. Aegerter v. Hayes, 55 S.D. 337, 226 N.W. 345. In our opinion no exception to this rule recognized by our cases is applicable under the evidence in the case at bar.

When final payment for the house was made in the fall of 1965 plaintiff testified to the following conversation with Krohn Myren:

> "A. * * * Krohn says, I would like to get the house cleaned up this year. I said, why not take half of it? He says, no, I will give you a few years more on the land, but I want the house cleaned up. I says, what kind of deal on the land if I pay the house off? He said, you can have the land for Ten Thousand down, and I said, what kind of terms? I said, would you consider Five Thousand per year, plus six per cent interest, and he says, O.K., which we had already agreed on the interest."

Krohn Myren denied he had at any time after expiration of the original option agreed plaintiff could purchase the farmland for $75 per acre. He did admit he always intended to give plaintiff a chance to buy the land at a price which would be mutually satisfactory to them. We fail to find anything in the record from

which it can be reasonably inferred that Krohn Myren agreed to extend the written option after its expiration at the price therein specified. Plaintiff's own testimony when the matter of sale was discussed in the fall of 1969 is vague and uncertain and implies lack of agreement on a specific price.[1]

We conclude plaintiff has failed to prove an enforceable agreement for the sale of real estate. Nevertheless, assuming arguendo an oral agreement may be inferred from the evidence as the trial court apparently found, we hold there was not sufficient part performance to take it out of the operation of the statute of frauds. In our opinion the facts upon which the court relied are not sufficient to establish part performance.

To constitute part performance, the facts relied upon must be unequivocally and, ordinarily, exclusively referable to the contract. 81 C.J.S. Specific Performance § 54, p. 538. This is not established by the evidence. The farm machinery was paid for before the option was executed although the Bill of Sale and option bear the same date. Plaintiff may not have had any particular use for the machinery and may have resold all or nearly all of it for slightly less than the purchase price, but the evidence shows and the court found the sale price was not disproportionate to its value. It is well to bear in mind the option was only a unilateral contract and did not become a binding contract until accepted by plaintiff. Renner v. Crisman, supra. This under plaintiff's own testimony did not occur until March 17, 1970, more than

---

(Direct examination)

1. "A. * * * I came in the house and he told me, I have been offered more money for the land, he says. I said, who made the offer? And he says, Pete Sittner, and I said, what kind of deal, and he says Fifteen Thousand a quarter and Fifteen Thousand down. I asked Krohn, you know what our agreement is, don't you, and he says, yes, Ten Thousand Dollars down. I says, I don't know whether I will be interested in paying more than I agreed to. I said, maybe I will give you Twelve Thousand. He said, I want more money to split my estate to the children. He didn't want to sell the land until after the first of the year. That's about all was said, and I said, I will come out after the first of the year."

(Cross-examination)

"Q. Did he say to you and you agreed to try to buy it at Fifteen Thousand Dollars a quarter? A. I never said really. He did and it came as a surprise to me, and that's about how we left it. When he was talking about the down payment, I asked him about it, and said, maybe I can give you Twelve Thousand. We never came to no agreement, no. Q. Was the expression used that you were to buy the land at Ninety Thousand Dollars? A. Six quarters would be Ninety Thousand. Q. Was that said? A. Krohn said something about Ninety Thousand. Q. Did you say to him, it's your land, and it's up to you to put the price on it? A. I don't recall it. Q. You are not denying it, but you don't recall it? A. No."

seven years later. The purchase of the machinery can hardly be said to be referable either to the option or the **contract** for purchase. Neither can it be considered as a part performance thereof.

We reach the same conclusion on the purchase of the house and for the same reasons. Again the evidence shows and the court found the price paid not disproportionate to its value. Plaintiff and his family lived in the house and paid rent until it was purchased. We can see little hardship or change of position because of this occurrence. It was a separate transaction and not related to the land.

Plaintiff's possession of the farmland in 1963 and continued possession from 1964 through 1970 is hardly referable to the option to purchase. More correctly, we believe, it is referable to his desire to farm the land on a crop share basis and not to own it. Of his own volition, he did not exercise his right to purchase within the time fixed in the option. Accepting his position of an oral extension from year to year, he at no time approached Myren and said he wanted to purchase the land. It was only when Myren advised him he was going to sell the land, about seven years after the option was granted, that he evinced an interest in purchasing it and still indicated he would prefer to rent.

We believe plaintiff's possession is not unequivocally and exclusively referable to the option of November 27, 1962, or any oral extension thereof, but is equally referable to his desire to farm the land in return for receipt of a share of the crop. 49 Am. Jur., Statute of Frauds, § 440, p. 745; Wiegand v. Gissal, 28 Wis. 2d 488, 137 N.W.2d 412. We fail to see any change of position or hardship because he continued to lease the farmland.

■ We then consider if plaintiff should recover damages, even though the court cannot decree specific performance. The rule is generally stated in 81 C.J.S. Specific Performance § 163(b), p. 780:

"In accordance with general rules in cases in which strictly equitable rules have been recognized or applied,

> it has been laid down that the case may not be retained to award damages to the party to whom specific performance is denied where such party would, in no event, be entitled to specific performance, and no other special equity or ground for equitable interference appears."

See also Leisch v. Baer, 24 S.D. 184, 123 N.W. 719.

We have carefully reviewed the evidence and conclude it is insufficient to sustain an allowance of damages upon equitable principles. Therefore, in our opinion the court's allowance of damages was clearly erroneous.

Having determined that the plaintiff is not entitled to recover, plaintiff's cross appeal becomes moot.

The judgment is reversed and the cause remanded with directions to enter judgment for dismissal.

BIEGELMEIER, Presiding Judge (concurs in part and dissents in part).

SDCL 15-6-52(a), RCP 52(a), requires that findings of fact "shall not be set aside unless clearly erroneous". In re Estate of Hobelsberger, 85 S.D. 282, 181 N.W.2d 455. The trial court found plaintiff's evidence to prove his claim for specific performance was not "clear and convincing"; that finding is not "clearly erroneous". I, therefore, concur the judgment insofar as it denied specific performance should be affirmed.

For the same reason the judgment for damages should be affirmed, as the court in the same finding then found "by a preponderance of the evidence" the parties did agree to the terms of sale as plaintiff testified. That finding and the finding of amount of damages are not clearly erroneous, so should not be set aside, and the judgment on that issue should also be affirmed.