[L.A. No. 29887. In Bank. Dec. 13, 1971.]

MARIAN A. WILLIAMS, Plaintiff and Appellant, v.
AMERICAN CASUALTY COMPANY OF READING,
PENNSYLVANIA et al., Defendants and Respondents.

## COUNSEL

Henry B. Niles, Boyko & Simmons and Michael W. Roberts for Plaintiff and Appellant.

Booth, Mitchel, Strange & Willian and Owen W. Strange for Defendants and Respondents.

## OPINION

**TOBRINER, J.**—Marian A. Williams, widow of Harold R. Williams, instituted this action against her husband's former employer, Atlantic Research Company (Atlantic) and the American Casualty Company of Reading, Pennsylvania (American Casualty) to recover benefits under a group disability insurance policy issued by American Casualty and administered in part by Atlantic. Mr. Williams died on October 25, 1964, 25 days after his employment with Atlantic had terminated, and defendants denied liability on the grounds that (1) the policy had terminated prior to Williams' death

and (2) that the death was not a result of an "accident" within the meaning of the policy.

Pursuant to a stipulation of the parties, the trial was bifurcated to permit the trial court, sitting without a jury, to determine initially the legal issue of whether, under the policy's terms, coverage continued to the date of Mr. Williams' death. The trial court concluded that the insurance policy's termination clause, providing for the termination of coverage "on the first premium due date following the date on which the Insured Person ceases to be an employee of [Atlantic]," was unambiguous, and that, pursuant to the clause, coverage had terminated on October 1, 1964, prior to Mr. Williams' death; the court accordingly entered judgment for defendants. Plaintiff appeals from that judgment, contending that the termination clause's reference to a "premium due date" is ambiguous, and that under one reasonable interpretation of the provision her husband was insured on the date of his death.

As discussed more fully below, we have concluded that in the context of a group insurance program in which employees' premium payments are administered through payroll deductions, the instant policy's unexplicated reference to a "premium due date" is, as plaintiff suggests, ambiguous. In a group insurance context, the term "premium due date" can reasonably be interpreted to refer either to the date on which the group's collective premium is "due" from the employer, or, alternatively, to the date on which the premium is "due" from the individual employee, i.e., the date the premium is paid by payroll deduction. Indeed, in the instant case, the uncertainty and potential confusion inherent in the policy's terminology finds ample demonstration in defendant-insurer's own varying answers to interrogatories specifically directed to this point. Under traditional principles, of course, such ambiguity must be construed against the insurance company, the draftsman of the policy, and since under the latter interpretation the policy remained in effect on the date of Mr. Williams' death, we conclude that the judgment for defendants must be reversed.

The facts underlying this litigation are not in dispute. On August 1, 1962, American Casualty issued to Atlantic a master insurance policy, VGA 18057, providing group insurance benefits for named beneficiaries in the event of accidental death or dismemberment of insured Atlantic employees; all Atlantic employees were eligible to become "Persons Insured" under the policy upon written application and payment of premium. Mr. Williams became an employee of Atlantic on October 9, 1962, and shortly thereafter he applied for and received an individual certificate evidencing accidental death insurance benefits in the face amount of $100,000, pay-

able to Mrs. Williams, his wife of 32 years, as beneficiary; the certificate declares the "effective date" to be December 1, 1962.[1]

Under the agreement with American Casualty, Atlantic administered its employees' payment of premiums through a payroll deduction program. Premiums were paid monthly and in advance, and Atlantic followed the uniform practice of deducting an employee's premium payments from the last paycheck which the employee received every month. Atlantic made such deductions monthly for the full amount of the insurance premium due to American Casualty; Atlantic itself contributed nothing whatsoever to the cost of insurance. After deducting the premium payments from its employees' wages, Atlantic completed a monthly report indicating the employees from whom premiums had been collected and sent this report, accompanied by a check for the total premiums collected, to the insurer. Although the insurer had instructed Atlantic by letter to complete the report as close to the first of the month as possible, Atlantic frequently allowed four to five weeks to elapse before it forwarded the form and its check to the insurer, and the insurer continually accepted the tardy reports and the employer's check without penalty.

Pursuant to its regular practice, Atlantic deducted Mr. Williams' $7.50 monthly premium from the paycheck prepared and paid on September 27, 1964, the end of the last regular pay period in September; Atlantic deducted the following monthly premiums from its covered employees on October 25, 1964. Atlantic, however, terminated Mr. Williams' employment on September 30, 1964, and on that date it issued Mr. Williams a termination paycheck for the abbreviated period of September 27 through September 30; this check included a refund of the $7.50 premium which had been previously deducted from the September 27th paycheck. Mr. Williams endorsed and deposited the termination paycheck on October 2, 1964.

Three weeks later, on October 25, 1964, Mr. Williams died. Plaintiff filed a timely claim with American Casualty seeking the benefits of her husband's group disability policy, but the insurer denied the claim and plaintiff then instituted the instant action to recover $100,000, the face

---

[1] The record is not entirely clear on precisely what date Williams' coverage under the policy actually commenced, since the master policy contains a provision which reads "All eligible employees . . . who within thirty-one days of becoming eligible to make application for coverage hereunder . . . make written application for such coverage and make the required premium contribution shall become Insured Persons as of the date they become eligible to make such application." Although the record reveals that Williams completed an insurance "enrollment" form on November 20, 1962, it does not show on what date he became "eligible" to make application or when the initial premium contribution was made.

amount of the policy. Under the terms of the policy, coverage was to terminate "on the first premium due date" following the termination of employment, and the insurer resisted plaintiff's claim on the ground that under this provision the policy's coverage had terminated on October 1, prior to Mr. Williams' death.

Plaintiff contended, on the other hand, that the policy's termination clause was at least ambiguous, and that the "first premium due date" after the termination of her husband's employment on September 30th could reasonably be interpreted to be October 25, 1964, when Atlantic's employees next paid their insurance premiums through payroll deduction. Since her husband had died on October 25, plaintiff contended under her suggested interpretation of the termination clause, Mr. Williams would still have been insured at the time of death. The trial court agreed with defendants' contention, however, and concluded both that the termination clause was unambiguous and that, pursuant to that provision, coverage had terminated on October 1, 1964, prior to Mr. Williams' death; the court consequently awarded judgment for defendants.

Inasmuch as the facts underlying this litigation are not in dispute, the trial court's finding that the terms of the policy were "plain and unambiguous" rested simply on its own interpretation of the language of the policy as written. ▮ In reviewing such a determination, we begin with the established principle that in such cases "an appellate court is not bound by the findings of the trial court [but] [o]n the contrary, it is the duty of the appellate court . . . to make its own independent determination of the meaning of the language used in the instrument under consideration." (*Schmidt* v. *Pacific Mut. Life Ins. Co.* (1969) 268 Cal.App.2d 735, 738 [74 Cal.Rptr. 367]; see, e.g., *Faus* v. *City of Los Angeles* (1967) 67 Cal.2d 350, 360 [62 Cal.Rptr. 193, 431 P.2d 849]; *Atchison, T. & S.F. Ry. Co.* v. *Abar* (1969) 275 Cal.App.2d 456, 465 [79 Cal.Rptr. 807].) Thus, we turn initially to the relevant provisions of the group disability policy in question.

▮ The crucial provision of the policy,[2] for the purposes of this ap-

[2] Actually there are two distinct documents drafted by the insurance company which may be characterized as the "insurance policy": (1) the master policy, issued by the insurer to the employer, and (2) the individual insurance certificate, issued by the insurer for the individual employees, but given to the employees by the employer. In *Humphrey* v. *Equitable Life Assur. Soc.* (1967) 67 Cal.2d 527, 533-534 [63 Cal.Rptr. 50, 432 P.2d 746], we adopted the position of a majority of American jurisdictions in holding that in the event of a conflict or ambiguity between these two documents, "the terms of the *certificate* are binding on the insurer." (Italics added.) In the instant case, both the individual certificate and the master policy contain the identical "Individual Termination" clause, and thus here there is no conflict to be resolved.

peal, is entitled "Individual Termination," and provides in pertinent part that "The individual coverage with respect to any Insured Person shall immediately terminate: (a) on the date of termination of the [Master] Policy in which event the Company will return the pro rata portion of any premium contribution unearned as the result of such termination; or (b) on expiration of the grace period if the Insured Person fails to make the required premium contribution; or (c) *on the first premium due date following the date on which the Insured ceases to be an employee of the Policyholder.*" (Italics added.) It is the operation of this final clause, subdivision (c), which is primarily at issue in the instant case; more specifically, we must determine whether the policy's reference to "the first premium due date" following the termination of employment is unambiguous and whether pursuant to that provision insurance coverage terminated prior to Mr. Williams' death.

We have found no provision, in either the individual certificate of insurance issued to the individual employee, Williams, or in the master group insurance policy issued solely to the employer, Atlantic, which attempts to define, or even to indicate, a "premium due date";[3] insofar as the record reveals, the policy itself does not mention the manner in which premiums were to be paid at all.[4] At trial, however, defendants contended, and the trial court agreed, that since (1) the effective date of the master policy was August 1, 1962, (2) the effective date of Mr. Williams' certificate was December 1, 1962, and (3) the employer had agreed to remit the premiums

[3] As we have noted in footnote 2, *supra, Humphrey* v. *Equitable Life Assur. Soc.* (1967) 67 Cal.2d 527, 533-534 [63 Cal.Rptr. 50, 432 P.2d 746], holds that in the event of a conflict between the terms of an individual certificate and language of a master policy, the provisions of the individual certificate will generally govern. Thus, even if the master policy had contained a provision defining "premium due date," such provision would not have sufficed to eliminate the ambiguity remaining in the terms of the individual certificate, the policy which, as *Humphrey* recognizes, "is the only document which the employee sees." (67 Cal.2d at p. 534.)

[4] In October 1962, a few months after the policy had been issued to Atlantic, American Casualty sent a letter to Atlantic, enclosing a form "Suggested Instructions" sheet to guide Atlantic in administering the group policy. This typewritten form did not refer to a "premium due date," but simply advised the insurer of the monthly reports it was to complete and that "[t]his report should be completed as close as possible after the first of each month." The form continued "The report includes all changes made during the previous month. However, changes are binding the day the insured completes his application for coverage in your office although you report the changes on the first of the month. All premiums are reported on the first of the month." The instructional sheet concluded with the request that the employer "[p]lease remit your check with your premium report." Defendants have, quite properly, not contended that this letter clarified the "premium due date" terminology of the policy. Not only does the letter designate no specific date on which the report, or premium payment, is "due" but, more importantly, even if it did, it could not elucidate the policy's language for an insured employee, who had absolutely no notice of this communication.

from its employees on a monthly basis and had regularly deducted those premiums from the last paycheck of every month, it was evident that premiums were "due" to the insurer on the first day of every month, and thus that the first of the month was the "premium due date" referred to in the policy. Since all the parties agree that Williams "ceased to be an employee" of Atlantic, within the meaning of the policy, on September 30, 1964, the court concluded that October 1, 1964 was the "first premium due date" following the termination of employment, and thus that pursurant to subdivision (c) of the termination clause, the policy had terminated on October 1, well before Williams' death on October 25.

■ Although in the context of an individual, as opposed to a group, insurance policy, the coalescence of a policy's "effective date" and the individual insured's regular premium payment practice may conceivably render a policy's unelaborated reference to a "premium due date" plain and unambiguous, no such clarifying practice emerges in a group insurance context. In *Elfstrom* v. *New York Life Ins. Co.* (1967) 67 Cal.2d 503, 509-510 [63 Cal.Rptr. 35, 432 P.2d 731], we described in some detail the division of administrative tasks between insurer and employer which distinguishes group insurance programs from normal individual insurance policies, and we recognized that one of the primary functions universally performed by the employer for the insurer is collection of premium payments from the individual employees and the forwarding of those payments to the insurance company. (67 Cal.2d at p. 509; see Ins. Code, § 10210.5.) Thus, whereas the payment of premiums in an individual policy is characteristically accomplished by a single act of the insured which may possibly reveal a specific, accepted "premium due date," there are, in a group insurance context, at least *two* stages of premium payment: (1) from the employee to the employer, normally by means of payroll deduction and (2) from the employer to the insurer.

If the policy's reference to a "premium due date" is to be ascertained by inference from an insured's payment practice, as defendant-insurer apparently urges, the "premium due date" could reasonably be interpreted either as the date when payment is "due" from the employee (the date of payroll deduction) or the date when payment is due from the employer to the insurer. Although the trial court thought that the clause could reasonably be interpreted to refer only to the date when payment is due from the employer to the insurer, we believe that from the standpoint of the employee, who typically has no control over, or even knowledge of, the date on which the employer forwards the premium to the insurer (see *Elfstrom* v. *New York Life Ins. Co.* (1967) 67 Cal.2d 503, 513 [63 Cal. Rptr. 35, 432 P.2d 731]), the date on which the amount of the insurance

premium *is deducted from his paycheck* could very reasonably be viewed as the date on which the premium is "due."[5]

The interpretation that the relevant date is that of the premium's deduction from the employee's paycheck is all the more plausible in a situation, such as the instant case, in which the employer makes no contribution to the premium payment and thus the payroll deduction constitutes the full amount of the premium due the insurer. The insurer, having drafted the policy as a group insurance plan and having arranged with the employer for payment of premiums through payroll deduction, was, of course, fully aware of the two-stage payment. By providing that the termination of insurance coverage should be governed by the "premium due date," but at the same time failing to specifically define the term, the insurer thus created an ambiguity as to the date of the policy's termination.

Indeed, although defendants now contend that the policy's terms are clear and unambiguous, their own varying answers to specific pretrial interrogatories on this point clearly illuminate the ambiguity inherent in the termination clause's unexplicated reference to a "premium due date." During pretrial discovery, plaintiff posed two separate interrogatories to defendant, the first inquiring as to "the premium due date of the policy holder [i.e., the employer] of [the] group policy" and the second seeking "the premium due date of the individual contributing employees." In its initial answer to these questions, filed less than three months after the inquiries had been posed, defendants responded (1) that the premium due date of the company was "monthly" and (2) that "[t]he premium due date of individual contributing employees would have been determined *by payroll deduction of the policy holder,* which under the contract had the duty of computing premiums, collecting premiums from the individuals insured and so forth, keeping in mind that the individual employees' premiums would be due with the reporting form." (Italics added.) By this response, the insurer itself recognized a potential distinction between a "premium due date" of the employer and the employee, and also indicatd that an employee's "premium due date" would depend on the "payroll deduction of the [employer]."

Three years later, however, after the trial of this matter had already com-

---

[5]The reasonableness of this interpretation is supported by the numerous authorities which hold that in a group insurance context the deduction of the premium from an employee's wages constitutes payment to the insurer. (See, e. g., *New York Life Insurance Company* v. *Love* (1967) 163 Colo. 7 [428 P.2d 364]; *Shanks* v. *Travelers' Ins. Co.* (N.D.Okla. 1938) 25 F.Supp. 740, 744; *Colantonio* v. *Equitable Life Assur. Soc.* (1951) 64 Ohio L.Abs. 490 [100 N.E.2d 716, 721-722]; cf. *Prudential Insurance Co. of America* v. *Roberts* (5th Cir. 1966) 358 F.2d 394. See generally 1 Appleman on Insurance, § 47, p. 72.)

menced and after these interrogatories had been brought to the court's attention, defendants filed "supplemental answers" to these two interrogatories, which did not in reality supplement the earlier answers but instead completely repudiated them. The "supplemental answers," conforming (not surprisingly) to the defendants' position at trial, declared that the premium due date of the employer "was the effective date of the policy [i.e., August 1, 1962] and the first day of each succeeding month thereafter that the policy is in force," and, similarly, that the premium due date of an individual employee "was the effective date stated on the certificate issued to an individual employee [i.e., December 1, 1962 for Mr. Williams] and the first day of each succeeding month thereafter during coverage."

Although defendants' "supplemental answers" came rather late in the instant case, the insurer is not bound, as a matter of law, to its initial answers to these interrogatories. The varying responses which the insurer has given, however, do illustrate quite clearly the potential ambiguity residing in the terminology of the "premium due date." Since the insurer itself suggested initially that the premium due date for an employee depended upon the date of payroll deduction, it can hardly persuasively contend now that the policy's language is not even reasonably susceptible of that interpretation.

In sum, we find that the policy's termination clause is ambiguous; under well-established principles such ambiguity must, of course, properly be construed against the insurer (e.g., *Gray* v. *Zurich Insurance* (1966) 65 Cal.2d 263, 269 [54 Cal.Rptr. 104, 419 P.2d 168]; *Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 437-438 [296 P.2d 801, 57 A.L.R.2d 914]). We therefore conclude that, pursuant to the policy's provision, coverage did not terminate until October 25, 1964, the first date following the termination of employment on which payroll deduction of premium occurred. Since Williams died on October 25, he was still insured under the policy on the date of his death and the trial court erred in holding to the contrary.[6]

---

[6]In the instant case defendants have not argued that the *time* of Williams' death on October 25 is significant, apparently conceding that if the policy did not terminate until October 25, 1964, Williams' death at any time on that date would fall within the coverage of the policy. The question of the relevancy of the time of injury was the precise issue addressed in the recent Court of Appeal opinion of *Green* v. *American Cas. Co.* (1971) 17 Cal.App.3d 270 [94 Cal.Rptr. 528]. The *Green* court, interpreting a group disability policy almost identical to that involved in the instant case, concluded that injury at any time on the date of termination was covered by the policy; we fully concur in that decision.

In reaching its conclusion on the "time of day" issue, however, the court in *Green* assumed that the "premium due date," was the "effective date" of the policy, an interpretation we have rejected above. Nevertheless, the *Green* decision cannot properly be viewed as contrary to our present determination. Since the insured

The fact that the premium payment deducted from Williams' September 27th check was refunded to him prior to his death does not negate plaintiff's recovery. As quoted above, subdivision (b) of the insurance policy's "Individual Termination" clause does provide for the lapse of the policy in the event an insured fails to pay his premium; since Williams' September 27th payment was promptly returned to him, his premium did remain unpaid and this past due premium would apparently bring subdivision (b) into play. When insurance coverage is to be terminated for non-payment of premium, however, the policy specifically provides for a 31-day grace period during which the policy remains fully in force.[7] Thus even if the premium due on September 27, 1964 remained unpaid, Williams' death on October 25 fell well within the grace period, and thus coverage was not yet terminated under subdivision (b). According to the policy's own terms, the refund of Williams' premium would appear to have no other effect on the termination of insurance.

The insurer argues, however, that its policy could not reasonably have been designed to extend coverage beyond the period for which the insured had actually paid; since Williams' advance premium payment for the month of October (the September 27th deduction) was returned on September 30th, defendants suggest that Williams could not reasonably expect his insurance to remain in effect beyond the end of September. This argument rests on a false premise, however, since insurance policies frequently provide, as part of the general benefits, that coverage shall extend for a limited period beyond the time for which payments have been specifically made. The clause in the instant policy providing for a 31-day grace period after non-payment of premiums, for example, clearly extends coverage in precisely this manner.

The group disability policy in question might well have been designed to afford to a discharged employee coverage for a short period after the

---

in *Green* had been injured on the effective date of the policy both parties in that case directed their full attention only to the *time* of day issue; the Court of Appeal merely adopted, *without discussion,* both parties' assumption that the "effective date" was also the "premium due date." This assumption by no means constituted a *holding* that the "premium due date" was equivalent to the "effective date" of the policy, and thus defendants' present reliance on *Green* is misplaced.

[7]Both the individual certificate and the master policy contain identical "Grace Period" clauses, which provide: "Unless coverage is terminated as hereinafter provided, a grace period of 31 days will be granted the Policyholder for the payment of each premium falling due after the first premium during which grace period the Policy shall continue in force. . . ." Subsection (b) of the "Individual Termination" clause provides that individual coverage shall immediately terminate "on expiration of the grace preiod if the Insured Person fails to make the required premium contribution."

termination of employment in order to afford him some opportunity to acquire substitute insurance before his coverage lapsed. In fact, Insurance Code section 10209 provides that a 31-day "carryover period," after the termination of employment, is a *mandatory* benefit of group *life* insurance policies,[8] and it is quite reasonable that the instant group disability policy would provide a similar, if less extensive,[9] benefit. Therefore, even aside from the policy's grace period, the refund of Williams' September 27th premium payment does not logically preclude the continuation of coverage until October 25.

To reiterate, we have determined that in the context of a group insurance program, the instant policy's unexplicated reference to a "premium due date" is ambiguous and that this ambiguity must be construed against the insurer who drafted the policy and who is in a position to eliminate the policy's potential confusion. As the creator of that confusion the insurer can hardly complain if it must suffer the consequences.

In the instant case the insurer could cure the ambiguity by the addition of a provision precisely defining the "premium due date." In the absence of such a clarifying provision, an insured could reasonably interpret the "premium due date" as the date on which his payment was "due" to the employer, i.e., the date the premium was regularly deducted from his paycheck. Under such an interpretation the instant policy was in effect on the date of Williams' death, and we thus conclude that the trial court erred in finding that coverage had terminated at an earlier date.

The judgment for defendants is reversed and the cause remanded to

---

[8]Section 10209 provides in relevant part that the individual certificate delivered to an employee insured under a group life insurance policy, must contain (1) "[a] provision that if the employment terminates for any reason whatsoever and the employee applies to the insurer within 31 days after such termination, paying [the appropriate] premium . . . . he is entitled, without producing evidence of insurability, to the issue by the insurer of any individual life policy . . . customarily issued by the insurer"; and (2) "[a] provision that if the employee dies during the 31-day period within which he is entitled to have individual policy issued to him . . . the amount of life insurance which the employee is entitled to have issued to him . . . shall be payable as a claim under the group policy, whether or not application for the individual policy or the payment of the first premium therefor has been made."

[9]Section 10209, subdivision (b), provides for a mandatory "conversion" clause, under which the insurer is required to issue an individual life insurance policy to any discharged employee who applies for such a policy within 31 days of the termination of employment. Under the instant group disability policy, the insurer does not have an analogous obligation to furnish equivalent insurance upon request.

the trial court for further proceedings on the issue of whether the insured's death was the result of an "accident" within the meaning of the policy.

Wright, C. J., McComb, J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.