**TEIGEN CONSTRUCTION, INC.,**
**Plaintiff and Respondent,**

v.

**PAVEMENT SPECIALISTS, INC.,**
**Defendant and Appellant.**

**No. 12041.**

Supreme Court of South Dakota.

Argued Jan. 11, 1978.

Decided June 20, 1978.

Rehearing Denied July 21, 1978.

John E. Burke, of May, Johnson & Burke, P. C., Sioux Falls, for plaintiff and respondent.

Richard O. Gregerson, of Woods, Fuller, Shultz & Smith, Sioux Falls, David P. Hiller, of Dunbar, Kienzle & Murphey, Columbus, Ohio, for defendant and appellant.

MORGAN, Justice.

This action arose between the parties to a subcontract for spall work on I–29, which subcontract was entered into between Pavement Specialists, Inc. (PSI), the prime contractor under a state contract, and Teigen Construction, Inc. (Teigen). Teigen commenced suit for the payment of money claimed due and PSI counterclaimed for damages for failure to fulfill the contract. A trial to the court resulted in a judgment in favor of Teigen on its complaint and against PSI on its counterclaim. PSI appeals. We concur in the result, but for different reasons.[1]

The prime contract was for a project originally encompassing a 14.716 mile stretch of the interstate in Lincoln County.[2] PSI originally subbed the work to Sweetman Construction (Sweetman) in August of 1971, and Sweetman completed the northbound lanes. After a dispute arose between Sweetman and PSI, Teigen agreed to take over the balance of the work that Sweetman had not finished. After meeting in early February, and again on April 2, 1973, the subcontract was executed. At that time there were four existing construction change orders (CCOs) which increased the number of spalls that needed repair over and above the number specified in the original contract between the State and PSI.

What should ordinarily be a rather simple exercise of reading the contracts and determining the rights of the parties is considerably beclouded, partly because of the nature of the work involved in the contract and partly by reason of circumstances beyond the control of either party.

The record discloses that apparently a contract between the State and any contractor doing spall work provides for a specific quantity of spalls to be repaired, with further provision for increasing this number from time to time as the need becomes apparent. The process of determining what joints need spall work is a continuing process throughout the project wherein a State crew, working a short distance ahead of the repair crew, tests the seams and marks those that require repair and the extent thereof. Then from time to time the CCOs are authorized, raising the quantity so that the contractor can be paid.

To compound this situation, on August 7, 1973, PSI directed Teigen to cease its work when the quantities covered by existing CCOs were reached, as the State was unsure of its future federal funding for the project. There is some dispute between the parties whether this hiatus continued for a period of forty-six days or for only twenty days, but, when it ended, there was a new CCO # 5 calling for an additional 16,108 square feet of spalls and allowed an additional forty-two construction days to complete the projects which would have put Teigen into cold weather concreting and would have projected it into the next construction season. Teigen refused to concur in the CCO, claimed it had finished its contractual obligations under its subcontract, and packed up and left.

The subcontract first provides:

The Minnehaha County contract was likewise subbed to Teigen but PSI was performing the Lincoln County work.

---

1. *Limmer v. Westegaard*, S.D., 251 N.W.2d 676 (1977).

2. PSI was also the prime contractor on similar contracts in Minnehaha and Lincoln Counties.

Subcontractor, at its own cost and expense, agrees to furnish all materials, labor, machinery, equipment and tools necessary to fully complete and perform all of the work and to fully construct all of the improvements in accordance with the terms of the contract and the plans and specifications relating to said work to be performed and constructed under the following item numbers of the proposal submitted by P.S.I. to the [state] in connection with the above described contract. The item numbers, with a description of the work to be performed by Subcontractor are set out below, together with the unit prices, for which Subcontractor will be paid by P.S.I. Work to be performed on the complete southbound lane of I–29 on the referenced project: . . . .

It next provided in pertinent part:

P.S.I. does hereby sublet to Subcontractor the above listed items of work and agrees to pay said Subcontractor for said items of work at the unit prices set opposite the respective item number.

Teigen claimed excuse from completion upon either one or both of two grounds. First, that the contract was entered into with the understanding that Teigen would only be required to complete approximately 21,000 square feet of spall repair. The second is that, regardless of the quantity, the contract was restricted to one construction season.

With respect to the first contention, the subcontract is silent as to any specific quantity, but it does state "work to be performed on the complete southbound lane of I–29 on the referenced project." The referenced project was No. FI 029–2(1) and was described in the specifications of the prime contract as "begins approximately 150 feet east and 1313.3 feet north of the interior one quarter corner of section 19–T98N–R50W ends south one quarter corner of section 31–T96N–R50W length 14.176

miles." The subcontract provided that the plans, specifications and prime contract were made a part by reference, that Teigen was familiar with them, and that it would complete the work sublet in accordance therewith. The trial court made findings of fact that at the time the subcontract was entered into, there were four construction change orders outstanding which required PSI to complete as of that date a balance of 21,080 square feet of Class A spalls, and that CCO # .5 called for an increase of approximately 80% over the original amount of the subcontract. The trial court further concluded as a matter of law that the 21,080 square foot amount was considered by the parties and the involved highway engineers to substantially reflect the actual amount of work that would have to be done under the prime contract and subcontract. With these findings and conclusions we disagree.

We can read the contracts for ourselves without the presumption in favor of the trial court's determination.[3] The subcontract is silent as to quantity. The prime contract, which is incorporated in the subcontract, provides for increase or decrease. Where a subcontractor undertakes to do a portion of the contract work according to plans and specifications binding on the principal contractor, such plans and specifications become a part of his contract at least to the extent that the subcontractor assumes the obligation of the general contractor in relation to the particular part of the work he performs.[4] Likewise, with respect to Teigen's contention that the contract was limited to one construction season, neither the prime contract nor the subcontract contain any limitation as to time. Any evidence introduced in support of these contentions in an attempt to vary the terms of the written agreement would be inadmissible under the parol evidence rule;[5] however, it may be admissible for purposes

3. *Williams v. American Gas Co. of Reading, Pa.*, 6 Cal.3d 266, 98 Cal.Rptr. 814, 491 P.2d 398 (1971).

4. *Ehret Magnesia Mfg. Co. v. Gothwaite Co.*, 80 U.S.App.D.C. 127, 149 F.2d 829 (1945).

5. SDCL 53–8–5; *Skjoldal v. Myren*, 86 S.D. 111, 191 N.W.2d 809 (1971).

hereinafter noted. We hold, therefore, that the evidence does not support the findings of the court in this regard, nor do the findings support the conclusions of law.

The next issue we consider is the enforceability of the contract. The trial court found that the parties to the prime contract were free to agree between themselves as to whether to increase or decrease work, or they could effectively cancel all work, and that PSI executed CCO # 5 primarily as a means of obtaining additional work on another project. He then concluded, as a matter of law, that there was no consideration recited for the execution of the subcontract by the parties, and that mutuality was absent because only Teigen was bound to perform and the rights of Teigen existed strictly at the option of PSI. This, in our opinion, is the pivotal issue, and we disagree with the conclusion of the court. Appellant urges, and we agree, that the subcontract was a requirements contract, which is simply one in which one party promises to supply all the specific goods or services which the other party may need during a certain period at an agreed price.

The weight of authority has supported the rule that a valid agreement is formed when one party agrees to furnish and the other to accept and pay for a commodity in such quantity as the buyer's business will require or need for a designated period of time. The fact that the promise to buy the quantity required is an implied promise, such as a promise implied from the buyer's statement that he accepts, has been considered not to make the agreement invalid for want of mutuality.[6]

While, generally, the courts will not inhibit the performance of requirement contracts, ordinarily, where the quantity ordered is considerably more or less than anticipated from a reading of the contract terms, the courts will protect the aggrieved party from unfair usage by applying a test of good faith to the other party's actions.[7]

That the 80% increase in quantity is considerably more than anticipated can hardly be questioned, so we then look to the good faith of PSI in attempting to require Teigen to complete the project, although it would be projected into another construction season. In this limited respect, the evidence regarding representations as to the amounts and the one-season work are admissible. While the contracts were silent, the testimony and exhibits clearly establish, and the trial court so found, that, in the contemplation of the parties, the project would be completed in one season. Why it was not is a matter of dispute. Whether it was inadequate performance by Teigen's crew or the cessation of construction awaiting funds developments, that evidence was before the trier of the facts and we are bound by his findings unless clearly erroneous (SDCL 15–6–52). In this regard the trial court specifically found that Teigen had completed all contracted work in the first construction season, and within the specified number of contract working days, and that the State, as owner, completely shut down the Lincoln County job on August 8, 1974, until the issuance of CCO # 5, and this shutdown was to the detriment of Teigen for causes not associated with any acts of Teigen. Viewing the evidence in a light most favorable to the findings, we find substantial support for these findings.

The most important findings of the trial court going to the question of good faith are the findings regarding the right of PSI to agree to increase the work, or to effectively cancel all additional work, an issue that was hotly contested by PSI. The trial court specifically found, however, from the testimony of the State Highway Department Field Operations Engineer, that it was the State's established policy that if increasing quantities get into the area of a

---

6. *Tampa Shipbuilding & Engineering Co. v. General Construction Company* (5th Cir. 1930) 43 F.2d 309, 311; see also 67 Am.Jur.2d, Sales, § 138. This same type of contract is applicable to Highway contracts; see *Webber v. Johnston*, 214 Cal. 378, 5 P.2d 886 (1931).

7. *Shader Contractors, Inc. et al. v. U. S.* (1960) 276 F.2d 1, 4, 149 Ct.Cl. 535.

substantial increase, and the contractor is not agreeable, that the State does not require the contractor to perform the increased quantity if it is going to be a hardship on him. A further finding on the testimony of the engineer tied PSI's interest in enlarging the Union County contract, which they themselves were performing, to the agreement to enlarge the Lincoln County contract, or in the alternative, if the Union County contract was deleted, the Lincoln County work should be deleted, to which the State was agreeable. The most telling finding by the trial court in this regard was his finding of the testimony of John Reese, President of PSI, to the effect that if the State rejected his demand to increase the Union County project, he would have arbitrarily and immediately terminated operations in Lincoln and Minnehaha Counties. Since this testimony was an admission on the part of an officer of PSI, it is binding on the defendant.[8]

In our opinion, the evidence specifically alluded to supports the findings of the trial court and its conclusion that the State and PSI were free to agree between themselves as to whether or not to increase or decrease work, or effectively cancel all work.

In the light of these findings and conclusions, we hold that PSI, by signing the CCO # 5 knowing that there had been a delay of at least twenty days, and also that the change order would add another forty-two days to the project, all of which would project Teigen into the next construction season with the attendant extra costs of relocating and re-signing, when in the alternative it could have relieved itself and the subcontractor from such additional costs, did not demonstrate the good faith requisite to hold the subcontractor to his contract.[9]

Therefore, we affirm the judgment of the trial court but for the reasons given above.

DUNN, C. J., ZASTROW and PORTER, JJ., concur.

WOLLMAN, J., concurs in part and dissents in part.

WOLLMAN, Justice (concurring in part, dissenting in part).

I agree that the contract in question was not unenforceable for lack of mutuality of obligation and that it was not restricted to 21,080 square feet of repair work or to completion within one construction season. I strongly disagree, however, with the holding that PSI could have unilaterally relieved itself of any further obligation on the Lincoln County project by refusing to sign any further change orders.

There is no question but that no one, including the state's engineers and project supervisors, knew at the outset of the contract exactly how much repair work would ultimately be needed. Indeed, that is why the state took pains to modify its standard specifications by including a special paragraph that provided that the Department of Highways reserved the right to increase the quantity of the work to be done, that such increases should not invalidate the contract, and that the contractor agreed to accept the work as altered. There was no testimony from anyone in a position of authority within the Highway Department to the effect that PSI would have been relieved of its obligation to enter into construction change order number 5 had it merely asked for such relief. Moreover, as I read the record Mr. Reese did not testify that PSI would have terminated the Lincoln-Minnehaha County project had the state not agreed to increase the Union County project. Rather, he testified that he informed Highway Department officials in August of 1973 that if the Union County project was to be terminated by the state, then the Lincoln County project should also be terminated. The difference in the two interpretations of Mr. Reese's testimony involves more than a semantical quibble, for under the interpretation given by the majority opinion PSI is cast in the role of a bad faith manipulator who sought to benefit itself at the expense

---

**8.** *Drier v. Perfection, Inc.*, S.D., 259 N.W.2d 496 (1977); 2 Jones on Evidence (2nd ed.), § 978, p. 1795.

**9.** *Shader Contractors, Inc. et al. v. U. S.*, supra.

of its subcontractor, whereas under the interpretation that I believe the record compels, PSI was merely seeking equitable treatment from the state.

Because I believe that PSI was bound by the change order in question, I would hold that Teigen was also bound to complete the work under its subcontract. That Teigen was responsible for its own delays in completing the project seems abundantly clear from the testimony of the state inspector who was on the scene to the effect that Teigen's crew members were poorly trained and supervised (Teigen's job superintendent was a former railroader with limited construction experience), that they frequently left the job site to drink coffee in nearby cafes, that they drank beer during working hours, that Teigen's equipment was dilapidated and frequently out of commission, and that in general the work was not carried out efficiently. Indeed, Teigen's job foreman testified that because the Lincoln County and Minnehaha County crews were alternated every Monday morning to equalize the pay differential on the two projects, there was a good deal of confusion regarding job responsibilities and the like. He acknowledged that it had come to his attention that crew members were drinking on the job. In a word, then, the only fair inference to be drawn from the evidence is that Teigen could not possibly have completed the project in one season—and this through no fault of PSI's.

As the majority opinion points out, this should have been a rather simple matter to decide. As it has turned out, however, this has been a troublesome case. It was pleaded and tried on one theory, decided on another theory, and now affirmed on appeal on still a third theory.

I would reverse and remand with directions to enter judgment for PSI.