[No. A026069. First Dist., Div. One. Nov. 20, 1986.]

MARY L. MARKS, Plaintiff and Appellant, v.
MINNESOTA MINING AND MANUFACTURING COMPANY et al.,
Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, the portion of the opinion to be published follows.

COUNSEL

Thomas E. Kotoske for Plaintiff and Appellant.

Paul H. Cyril, Charles F. Preuss, Jack Berman and Bronson, Bronson & McKinnon for Defendants and Appellants.

OPINION

**NEWSOM, J.**—The present appeal is from judgment following a jury verdict in plaintiff's favor in a products liability action. The product involved

is an inflatable mammary prosthesis used in breast augmentation surgery. Following the verdict, the trial court granted a motion notwithstanding the verdict and deleted the jury's award of $75,000 in punitive damages. Plaintiff appeals, seeking reversal of the judgment regarding punitive damages. Defendants cross-appeal, urging that the award of compensatory damages be reversed.

A brief summary of the procedural background reveals the following. On January 20, 1982, plaintiff filed a complaint for strict products liability, breach of warranty, and negligence against Minnesota Mining and Manufacturing Company (3M) and McGhan Medical Corporation. 3M and McGhan Medical Corporation promptly filed separate answers to the complaint. On November 3, 1982, after a noticed motion, plaintiff filed a first amended complaint which added a claim for punitive damages and specifically named McGhan Medical Corporation, a California Corporation (McGhan/Cal.), McGhan Medical Corporation, a Delaware Corporation (McGhan/Del.), and McGhan Medical/3M, a division of 3M (McGhan/3M) as defendants.

The case was submitted to the jury solely on a theory of strict products liability. Following a 10-day trial, the jury returned a verdict in favor of plaintiff, assessing compensatory damages of $25,850 and punitive damages of $75,000 against 3M and McGhan/3M. After entry of judgment on the verdict, defendants moved for a new trial and for judgment notwithstanding the verdict. The motion for new trial was denied, but a judgment notwithstanding the verdict was entered deleting the award of punitive damages. Plaintiff filed a timely notice of appeal on February 6, 1984, and defendants cross-appealed.

In relevant part the factual background may be summarized as follows. In November 1974, five former employees of Heyer-Schulte Corporation, a medical products manufacturer, formed McGhan Medical Corporation, a California corporation. In the fall of 1975, the founders of McGhan/Cal. decided to manufacture an inflatable mammary prosthesis, or implant, for use in breast augmentation surgery.[1] Production of the McGhan inflatable prosthesis began in October 1975 and the product was generally available for sale to physicians by early 1976.

In early 1977 plaintiff decided to have breast augmentation surgery. Dr. Robert Kropp performed the surgery in April 1977, using two McGhan

---

[1] Inflatable implants are manufactured by dipping a mandril into a silicon solution, similar to the manner in which latex gloves are produced. After implantation in the patient, the device is filled to the desired volume with saline. Plaintiff's doctor preferred this type of implant to the type filled with silicone gel.

inflatable implants. In June of the same year, McGhan/Cal. was acquired by a wholly owned Delaware subsidiary of 3M which was also named McGhan Medical Corporation.[2] McGhan/Del. continued to manufacture and market the McGhan inflatable implant without alteration.

In May 1978 an internal company memorandum reported on complaints about the inflatable and noted its "alarming rate" of deflation. From 63 complaints in 1976, and an equal number in 1977, the number rose to 160 in 1978. In June 1978 an agent from the Federal Food and Drug Administration, which oversees the manufacture of such medical devices, came to McGhan/Del. for an inspection.[3] The inspector requested but was refused access to complaint files by Laurens Wallace, a McGhan/Del. quality assurance supervisor.

In October 1978 plaintiff's left implant spontaneously deflated. Neither plaintiff nor her doctor knew the cause. Plaintiff thereupon underwent a second surgery in which the deflated implant was replaced with another McGhan product. Unlike the first two implants, the new left implant had been manufactured by McGhan/Del., after the 3M acquisition.

In April 1979 the McGhan inflatable prosthesis was removed from the market. One of the reasons for removing the product was the troublesome rate of deflations being reported to the company. A cause of these deflations was the tendency of the thin shell of the implant to crease inside a woman's body. Leaks in the shell would then develop along the crease. Formation of the creases was aggravated by normal contractions of tissue around the implant.

In May 1979 plaintiff's right implant spontaneously deflated. In a third surgery, the implant was replaced with a Heyer-Schulte implant. By this time, plaintiff's doctor had noted a number of deflations of McGhan implants and had discontinued use of the McGhan product.

---

[2] The acquisition was termed a "reorganization" pursuant to the beneficial tax treatment accorded by Internal Revenue Code section 368(a)(1)(C). The result was that McGhan/Cal. received shares of stock of 3M, which it was obligated to distribute to its shareholders. McGhan/Cal. was further obligated, pursuant to the agreement and plan of reorganization to wind up and dissolve "as soon as practicable." It did, in fact, file an amendment to its articles of incorporation the same month that the reorganization took place, changing its name to "MMC Liquidation Corp." The following month it filed its certificate of election to wind up and dissolve, and by September 1977 it had distributed its assets and dissolved.

[3] Federal regulation of medical devices was minimal prior to enactment of the 1976 medical device amendments to the Food, Drug, and Cosmetic Act (21 U.S.C. § 301 et seq.). (1976 U.S. Code Cong. & Admin. News, at p. 1070 et seq.)

In August 1979, complaints regarding the McGhan inflatable resulted in a second inspection by the FDA. At this time, Wallace—rather than allowing access to the complaint files—provided the inspector with graphs portraying the number of deflations of inflatables. The graphs indicated that as of April 1979, 158 complaints had been received.[4] In April 1980 the FDA again requested the number of complaints received regarding inflatables and was told that there were 500 to 600 complaints.

On January 1, 1981, 3M's wholly owned subsidiary (McGhan/Del.) was reorganized as a division of 3M and dissolved. From that date forward, the McGhan operations were conducted by 3M.

In November 1981 plaintiff's left implant (the third McGhan inflatable) deflated and was replaced in a fourth surgery with a Heyer-Schulte implant. In January 1982 the complaint was filed.[5]

On appeal, plaintiff argues that the order granting 3M's motion for judgment notwithstanding the verdict as to punitive damages was incorrect on both the legal and factual bases enumerated in the order. The precise statement of the trial court in support of its order deleting the jury's award of punitive damages was as follows: "Said Order is based on the determination of the Court that:

"1. Defendant corporations as successor corporations to the manufacturer of the product were not liable for punitive damages, and

"2. There was no evidence of sufficient substantiality to establish malice, that is, conduct which was intended to cause injury to the Plaintiff or conduct carried on by the Defendants with a conscious disregard of the rights and safety of the Plaintiff."

. . . . . . . . . . . . . . . . . . . . . . . .*

Before plunging into the intricacies of the McGhan-3M relationship, we note that 3M neither designed nor manufactured the implant that injured plaintiff. McGhan/Cal. and its original founders conceived the design and first manufactured and marketed it. According to plaintiff's expert, McGhan/

---

[4]Subsequent testimony indicated a cumulative total number of complaints as high as 425 for the years between 1976 and 1979.

[5]The trial court subsequently determined that plaintiff's cause of action for the first two deflations was barred by the statute of limitations.

*See footnote, *ante*, page 1429.

Cal. knew of the design problems, did not properly test the product, and received the initial complaints. McGhan/Del., the 3M subsidiary, actually manufactured and sold the third implant that injured plaintiff. It received many additional complaints and inquiries from the FDA, but continued to market the product without change. Eventually, and prior to its merger with 3M, McGhan/Del. removed the product from the market. Before 3M may be found liable for punitive damages, the evidence must therefore establish that 3M succeeded to the liability of McGhan/Del. McGhan/Del. could be liable for punitive damages either because of its own acts or (if found to be the successor to McGhan/Cal.'s liability) those of McGhan/Cal.

. . . . . . . . . . . . . . . . . . . . . .*

 3M argues that even if the facts support an award of punitive damages against McGhan/Cal. or McGhan/Del., as a successor corporation, 3M itself is not liable for these damages. To resolve this issue, we must examine the nature and effect of the transactions whereby McGhan/Cal. and then McGhan/Del. were acquired by 3M, as well as the applicable law.

We commence our inquiry with the observation that section 1107 of the Corporations Code provides, inter alia: "Upon merger pursuant to this chapter the separate existence of the disappearing corporations ceases and the surviving corporation shall succeed, without other transfer, to all the rights and property of each of the disappearing corporations and shall be subject to all the debts and liabilities of each in the same manner as if the surviving corporation has itself incurred them." Thus, in *Moe v. Transamerica Title Ins. Co.* (1971) 21 Cal.App.3d 289 [98 Cal.Rptr. 547], punitive damages were assessed against a corporate successor for the actions of a defendant predecessor corporation. (*Id.,* at pp. 303-304.) Relying on governing provisions of the California Corporations Code, the *Moe* court held that the corporation formed by a consolidation or merger succeeded by operation of law to all of the obligations and liabilities of the constituent corporations. (*Id.,* at pp. 304-305.)[10]

In *In Re Related Asbestos Cases* (N.D.Cal. 1983) 566 F.Supp. 818, cited by 3M, a series of complicated transactions culminated in a parent-subsidiary merger between Celotex Corporation and Briggs/Panacon, its wholly owned subsidiary. (*Id.,* at p. 820.) The court declined to discuss the effect of the mergers, concentrating instead on an analysis of the similarities between

---

*See footnote, *ante,* page 1429.

[10]Consolidation has been eliminated from the Corporations Code and is now regulated as a merger or a reorganization. (See legis. committee com., Deering's Ann. Corp. Code, §§ 1100, 1200 (1977 ed.) pp. 110-111, 137.)

the first corporation and the entity which survived after four mergers. (*Id.*, at pp. 821-824.) We cannot embrace this analytical approach, if only because the issues of corporate similarity or continuity of a predecessor's product line are of no significance where, as here, the *form* of the acquisition dictates that liabilities are passed on. (See, e.g., *Ray* v. *Alad Corp.* (1977) 19 Cal.3d 22, 28 [136 Cal.Rptr. 574, 560 P.2d 3]; *Krull* v. *Celotex Corp.* (N.D.Ill. 1985) 611 F.Supp. 146, 148-149.[11]

■ While it is the general rule that a purchaser of assets for cash does not assume the seller's liabilities, there are several exceptions to that rule, one of which—where a de facto merger has occurred—we find applicable here.[12] This exception applies where the assets of one corporation are transferred without consideration which can be made available to satisfy claims or "where the consideration consists wholly of shares of the purchaser's stock which are promptly distributed to the seller's shareholders in conjunction with the seller's liquidation (*Shannon* v. *Samuel Langston Company* (W.D.Mich. 1974) 379 F.Supp. 797, 801)." (*Ray* v. *Alad, supra,* 19 Cal.3d at pp. 28-29.)[13]

■ Our analysis of the McGhan/Cal. to McGhan/Del. transfer reveals that the first transaction was carried out pursuant to an agreement, dated May 11, 1977, between 3M and McGhan/Cal. entitled "Agreement and Plan of Reorganization."[14] Pursuant to its terms, McGhan/Cal. was to receive

---

[11]There have been a number of cases involving Celotex and Phillip Carey Corporation. (See listing in *Krull* v. *Celotex Corp., supra,* 611 F.Supp. at p. 149.) The district judge in *Krull* noted that Celotex had failed to acknowledge the existence of the merger agreement and represented to the court that other jurisdictions "consistently held successor corporations not to be liable . . . ." (*Id.,* at p. 148.) The *Krull* court speculated that the three courts which had so held (including the Northern District of California in *In Re Related Asbestos Cases, supra,* 566 F.Supp. 818) may have been similarly misled by *Celotex.* (*Krull, supra,* 611 F.Supp. at p. 149, fn. 4.)

[12]Obviously, this ground is not confined to an actual statutory merger as that transaction, which transfers all liabilities as a matter of law, is outside the general rule of nonliability for sales of assets. (Corp. Code, § 1107.)

[13]We note that the Ninth Circuit in *Gee* v. *Tenneco, Inc.* (9th Cir. 1980) 615 F.2d 857 expressed the opinion that this dictum in *Ray* does not necessarily mean that California adopts the de facto merger doctrine. However, for purposes of shareholder rights, the doctrine has been codified since 1977. (Corp. Code, § 1200.) Thus, California, like many jurisdictions, recognizes the de facto merger doctrine. (See, e.g., 15 Fletcher Cyclopedia of the Law of Private Corporations (1983) § 7122, pp. 188-202; *San Joaquin Ginning Co.* v. *McColgan* (1942) 20 Cal.2d 254 [125 P.2d 36] [de facto merger doctrine available to transfer tax liabilities]; *Schwartz* v. *McGraw-Edison Co.* (1971) 14 Cal.App.3d 767 [92 Cal.Rptr. 776, 66 A.L.R.3d 808], disapproved on other grounds in *Ray* v. *Alad, supra,* 19 Cal.3d at p. 34 [doctrine discussed, but not applicable on the facts of a tort case].)

[14]The agreement provided that transactions were undertaken pursuant to Internal Revenue Code section 368(a)(1)(C). That section defines an acquisition of substantially all of the property of the corporation in exchange for stock of another as a "reorganization," entitled to the same beneficial tax treatment as a merger. (§ 368 of the Int.Rev. Code.)

shares of 3M stock in exchange for all of its business, assets and goodwill, including the corporate name and the shares of stock of its foreign subsidiary. McGhan/Cal. was required by the agreement to change its name, distribute the 3M stock to its shareholders and dissolve as soon as practicable. All McGhan/Cal. employees, including the seven shareholders, were requested to sign employment agreements with 3M. All five founders of McGhan/Cal. continued to work for McGhan/Del. in substantially the same capacity after the reorganization. Thus, as described by Donald McGhan, the "operating board" (if not the formal board of directors) remained the same. All McGhan/Cal. shareholders became shareholders of 3M.

The agreement also provided for the assumption by 3M[15] of specified liabilities shown on the balance sheets. It expressly provided that taxes, liabilities covered by insurance, employment contract liabilities and the liability for specific, listed lawsuits were not assumed. A catch-all clause provided that liabilities not expressly assumed were excluded. In essence, all normal operating liabilities were assumed. The shareholders of McGhan indemnified 3M for all unassumed liabilities other than products liability claims and the listed lawsuits.[16]

Courts have described five factors which indicate whether a transaction cast in the form of an asset sale actually achieves the same practical result as a merger: (1) was the consideration paid for the assets solely stock of the purchaser or its parent; (2) did the purchaser continue the same enterprise after the sale; (3) did the shareholders of the seller become shareholders of the purchaser; (4) did the seller liquidate; and (5) did the buyer assume the liabilities necessary to carry on the business of the seller? (See *Shannon* v. *Samuel Langston Company* (W.D.Mich. 1974) 379 F.Supp. 797, 801; *Kloberdanz* v. *Joy Manufacturing Co.* (D.Colo. 1968) 288 F.Supp. 817, 821-822; 15 Fletcher Cyclopedia of the Law of Private Corporations, *supra*, §§ 7122, 7165.5, pp. 188-190, 339-340.)

We find *Shannon, supra,* particularly persuasive. There, Harris Intertype Corporation entered into an agreement with Samuel M. Langston Company to purchase assets in exchange for Harris stock. (*Shannon, supra,* 379 F.Supp. at p. 799.) Langston was required to change its name. It was subsequently dissolved and the Harris stock distributed to its shareholders. Harris assumed all obligations which were "necessary for the uninterrupted

---

[15]Although 3M was the initial purchaser under the agreement, its rights were assigned to its wholly owned subsidiary McGhan/Del., prior to the closing.

[16]An additional clause obligated McGhan/Cal. upon request by 3M to purchase products liability insurance for claims arising from products manufactured by McGhan/Cal. Of course, punitive damages cannot be covered by insurance. (Ins. Code, § 533.)

continuation of normal business operations . . . ." (*Id.*, at p. 801.) A Harris subsidiary took over and continued the operations of Langston under the name The Langston Company. The subsidiary was merged into Harris the year after plaintiff was injured by a product manufactured by the first Langston corporation. (*Ibid.*) The court characterized this transaction as a de facto merger, and on that basis found Harris liable for the damages due to the defective product. Reasoning from the premise that "[a] purchaser of corporate assets will be liable for the debts and liabilities of the transferor when the transaction amounts to a consolidation or merger of the seller and purchaser" (*id.*, at p. 800), the court concluded: "Public policy requires that Harris Intertype, having received the benefits of a going concern, should also assume the costs which all other going concerns must ordinarily bear." (*Id.*, at p. 802.) The court added that "solvent corporations, going concerns, should not be permitted to discharge their liabilities to injured persons simply by shuffling paper and manipulating corporate entities." (*Id.*, at p. 803.)

Here, as in *Shannon, supra,* the result of the transaction was exactly that which would have occurred had a statutory merger taken place, and we are accordingly convinced of the necessity and the fairness of transferring liability from McGhan/Cal. to McGhan/Del. Nor do we think it unfair that our conclusion negates the disclaimer of liability for "unknown claims" contained in the agreement. Since the disclaimer would have had no effect in a *statutory* merger, where, as here, all of the indicia of a de facto merger are present, the same result is entirely appropriate.

With respect to the second reorganization, McGhan/Del., the wholly owned subsidiary of 3M which manufactured the defective product at issue, was "reorganized" into its parent company 11 months before plaintiff's injury. Evidence of the nature of these transactions is sparse, consisting of the declaration of a 3M officer that effective January 1, 1981, McGhan/Del. was reorganized as a division of 3M and then dissolved. Counsel for 3M refers to the transaction as a "merger."

We acknowledge that under some circumstances a union of parent and subsidiary can result in termination of the subsidiary's liabilities. Such is not the case here, however.[17] McGhan/Del. continued doing business after the reorganization as "McGhan/3M," a component of its corporate parent. And since 3M was the sole shareholder, it is highly unlikely that cash was

---

[17](Cf. *Potlatch Corp.* v. *Superior Court* (1984) 154 Cal.App.3d 1144, 1151 [201 Cal.Rptr. 750] [parent sold assets of subsidiary at auction, subsidiary's business discontinued and dissolved: no liability to parent-shareholder].)

paid for the business of McGhan/Del. We therefore find that the reorganization amounted to a continuation or a de facto merger. Thus, when McGhan/Del. became a part of its parent, as a matter of corporate law it carried with it all of its liabilities. (*Ray* v. *Alad, supra,* 19 Cal.3d 22, 28-29; *Moe* v. *Transamerica Ins. Co., supra,* 21 Cal.App.3d at p. 289.)

We again decline to follow the approach taken by the court in *In Re Related Asbestos Cases, supra,* 566 F.Supp. 818, in which the original corporation was compared to the entity surviving after a series of mergers. Under the particular facts presented, whether McGhan as it existed in 1981 resembled the original McGhan/Cal. in 1974 is irrelevant. The critical fact is that while there was more than one merger or reorganization, an analysis of each transaction discloses to us that its intrinsic structure and nature, unlike a sale of assets for cash, was of a type in which the corporate entity was continued and all liability was transferred. All the indicia of a merger are present. We accordingly conclude that the second reorganization, like the first, transferred all liabilities to the surviving corporation. 3M is therefore liable for all liabilities of its subsidiary, including the punitive damages awarded to plaintiff.

. . . . . . . . . . . . . . . . . . . . . . . .*

The judgment notwithstanding the verdict is reversed with instructions to reinstate the judgment entered on the jury's verdict which included the award of punitive damages. . . .* Appellant Marks is entitled to costs on this appeal.

Racanelli, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied December 19, 1986, and the petition of appellant Minnesota Mining & Manufacturing Company for review by the Supreme Court was denied March 3, 1987. White, J.,† Kline, J.,† and Anderson, J.,† participated therein.

---

*See footnote, *ante,* page 1429.
†Assigned by the Chairperson of the Judicial Council.