Opinion
 

 PETERSON, J.
 

 This case involves questions of corporate successor liability. Appellant Cooper Laboratories, Inc. (Cooper) appeals from an order of the San Francisco Superior Court holding it potentially responsible, as successor in interest, for all damages allegedly incurred by Sandra and Michael Phillips (Phillipses) as the result of Sandra’s exposure to diethylstilbestrol (DES)
 
 in útero.
 
 The Phillips cross-appeal from the court’s order holding that another corporation, the Nestle-LeMur Company, Inc. (Nestle), was not responsible, as successor in interest, for the damages they allegedly sustained. We reverse the trial court’s order holding Cooper potentially liable for the Phillipses’ injuries. We affirm the trial court’s order exonerating Nestle.
 

 I. Factual and Procedural Background
 

 The Phillipses’ complaint filed November 1982 named over 150 defendants, apparently based upon the market share theory of liability enunciated
 
 *1642
 
 in
 
 Sindell
 
 v.
 
 Abbott Laboratories
 
 (1980) 26 Cal.3d 588 [163 Cal.Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061]. The complaint’s alleged causes of action were for negligence, “products liability,” “negligent manufacture,” breach of express warranty, fraud, “conscious disregard of others’ safety,” and loss of consortium.
 

 By order of November 1984 on motion for summary adjudication of issues, the trial court found, inter alia, that Sandra was born May 23, 1959; and that her mother, during her pregnancy with Sandra, had received by prescription of her physician a drug trade-named Milestrol, which was DES manufactured by E. S. Miller Laboratories, Inc. (Miller). Miller did not exist as a corporate entity at the date of said order.
 

 Following this order, Nestle and Cooper remained potentially liable as successors in interest to the liabilities of Miller; and in June 1986, Cooper successfully moved to bifurcate trial of the separate issue of successor liability from the remaining issues of the case. In November 1986, the successor liability issue was tried before the San Francisco Superior Court. At trial, the following facts were established.
 

 Miller was incorporated in California in 1926. It manufactured and sold ethical pharmaceuticals, i.e., drugs for which a doctor’s prescription is required. Between 1942 and 1958, Miller marketed Milestrol.
 

 In 1958, Nestle acquired three corporations which were involved in the manufacture and distribution of pharmaceuticals: the Carroll Dunham Smith Pharmacal Company (Smith), Miller, and the E. L. Patch Company (Patch). Each of these corporations was obtained through Nestle’s acquisition of all or substantially all of the stock of the acquired corporation.
 

 Shortly after these acquisitions in 1958, Nestle formed a fourth corporation in the State of New York, Smith, Miller & Patch, Inc. (SMP-NY). The purpose of SMP-NY was to market the pharmaceutical products of the three newly acquired corporations.
 

 Nestle, in 1958, began reorganization and consolidation of the functions of the various corporations which it had acquired. The raw materials and components in Miller’s laboratories and its product manufacturing functions were transferred to Smith; Smith thereafter produced Milestrol under another trade name. Miller’s product manufacture was, thus, transferred to Smith; Miller’s marketing and sales assets, including its good will, name, trademark “Milestrol,” sales force, retáil lists for marketing purposes and old inventories of Milestrol were transferred to SMP-NY for an adequate consideration. By January 1959, Miller had ceased all production of
 
 *1643
 
 Milestrol. From this point until its corporate existence ceased, Miller became solely a warehouse operation for the products developed and marketed by Smith, Patch, SMP-NY and Nestle. During this period, Miller was more profitable as a warehouse than it had been as a pharmaceutical operation.
 

 In 1964, Patch was dissolved as a corporation. In 1968, Miller was also dissolved pursuant to a vote of its sole shareholder Nestle.
 
 [1]
 

 In 1970, Nestle created a second corporation called Smith, Miller & Patch in the State of New Jersey (SMP-NJ). Immediately after its creation, SMP-NJ acquired SMP-NY and Smith by exchanging all of its stock for all of the stock of those corporations which had been owned previously by Nestle. As part of this transaction, SMP-NJ expressly assumed all debts and liabilities of SMP-NY. Immediately after this transaction, SMP-NY dissolved. In March 1972, SMP-NJ merged into Cooper.
 

 Based upon these facts, the court order held that Cooper was potentially liable to the Phillipses for their injuries as successor in interest to Miller. The court exonerated Nestle from any potential liability to the Phillipses. Cooper now appeals from the trial court’s order holding it potentially liable for the Phillipses’ injuries; the Phillipses cross-appeal from that portion of the trial court’s order exonerating Nestle.
 

 II. Discussion
 

 A.
 
 Cooper Appeal
 

 In finding Cooper potentially liable to the Phillipses, the trial court relied on the doctrines of corporate successor liability discussed by our Supreme Court in
 
 Ray
 
 v.
 
 Alad Corp., supra,
 
 19 Cal.3d 22. In
 
 Ray,
 
 the Alad Corporation (Alad I) manufactured ladders. The business was acquired by a second corporation, Alad II, through an asset purchase. Alad II continued the same manufacturing operation under the name “Alad Corporation,” using the same equipment, designs, and personnel; soliciting Alad I’s customers with the same sales representatives; and showing no outward indication of a change in ownership. The plaintiff in
 
 Ray
 
 was injured in a fall from a
 
 *1644
 
 defective ladder manufactured by Alad I before the transfer of the business. Thus, the plaintiff sued Alad II under a products liability theory.
 

 In
 
 Ray,
 
 the Supreme Court first discussed the rules ordinarily applied to the determination of whether a corporation purchasing the principal assets of another corporation assumes the purchased corporation’s liabilities. Thereunder, the purchaser does not assume the seller’s liabilities unless (1) there is an express or implied agreement of assumption, (2) the transaction amounts to a merger or consolidation of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller’s debts. (19 Cal.3d at p. 28.)
 

 After determining that Alad II could not be held responsible for the plaintiff’s injuries under the rules ordinarily applied, the court further announced an exception to the traditional rules of corporate successor liability, referred to by some subsequent courts as the “product line theory” or the “product line continuation theory”; “Justification for imposing strict liability upon a
 
 successor
 
 [italics in original] to a manufacturer under the circumstances here presented rests upon (1)
 
 the virtual destruction of the plaintiff’s remedies against the original manufacturer caused by the successor’s acquisition of the business,
 
 [italics added] (2) the successor’s ability to assume the original manufacturer’s risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer’s good will being enjoyed by the successor in the continued operation of the business.” (19 Cal.3d at p. 31.)
 

 Applying this three-pronged test to the facts before it, the Supreme Court first concluded that the plaintiff’s remedies against the original ladder manufacturer had been virtually destroyed by the corporate takeover. The plaintiff’s claim was not in existence at the time of Alad I’s dissolution, and was not included in claims paid during liquidation. The plaintiff was, thus, left with only the “formidable and probably insuperable obstacles” (19 Cal.3d at p. 32.) of attempting to satisfy a judgment against the former stockholders and directors. Because of such barriers to suit against the predecessor corporation, the Supreme Court concluded that successor liability was necessary to prevent a complete denial of redress against the manufacturer of a defective product.
 

 Second, Alad II had the same ability to spread the risk of defective products as did Alad I. The successor continued to manufacture the same product line with the same plant and equipment and with the same personnel as the original manufacturer. Under those circumstances, Alad II had
 
 *1645
 
 the same ability to estimate risks and meet them by providing insurance, as well as the ability to spread the cost of compensation among its customers.
 

 Third, it was fair and equitable to impose successor liability upon Alad II because it had marketed the same product under the same name with the use of its predecessor’s goodwill.
 

 The trial court here, in determining the potential liability of Cooper to the Phillipses, relied on a combination of the traditional rules of corporate successor liability and the exception stated in
 
 Ray.
 
 The court first noted that the merger between Cooper and SMP-NJ in 1972 made Cooper liable for all known and unknown liabilities of SMP-NJ. The court then held that the evidence at trial had established that SMP-NJ expressly assumed all known and unknown liabilities of SMP-NY. Finally, the court held that, under the
 
 exception
 
 to the traditional rules of corporate successor liability announced in
 
 Ray
 
 (product line theory), SMP-NY had contributed to the destruction of the Phillipses’ remedies against Miller; that SMP-NY had the ability to assume Miller’s risk-spreading role; and that fairness dictated SMP-NY be deemed the successor to Miller’s liabilities. Thus, in effect, the court traced Cooper’s liability to the Phillipses from Miller, to SMP-NY under the
 
 Ray
 
 exception, to SMP-NJ under traditional successor liability law, and finally to Cooper under the same traditional principles.
 

 On appeal, Cooper raised several arguments which it claims preclude a finding that it was responsible for Miller’s corporate liabilities. Since we find one of these arguments dispositive, we need not reach Cooper’s alternate arguments.
 

 Cooper claims that the trial court erred in its application of the
 
 Ray
 
 exception to Cooper’s successor liability.
 
 [2]
 
 We agree.
 

 Cooper does not challenge the court’s conclusion that it was responsible for all liabilities of SMP-NY as the result of its merger with SMP-NJ. Nor does Cooper claim that the trial court erred when it held that SMP-NJ became liable for SMP-NY’s liabilities by expressly assuming them. Thus, the issue is reduced to whether the trial court erred when it held that SMP-NY was responsible for all of Miller’s liabilities under the exception announced in
 
 Ray.
 

 
 *1646
 
 In considering the liability of SMP-NY for the Phillipses injuries, the trial court imposed such liability on the “product line continuation theory” of
 
 Ray, supra,
 
 by first citing as the definition of “continuation” of a product line the following language from
 
 Rawlings
 
 v.
 
 D. M. Oliver, Inc.
 
 (1979) 97 Cal.App.3d 890, 894 [159 Cal.Rptr. 119]: “[W]here the predecessor’s obligation is based on strict liability, the successor corporation may be liable for a product defect under the principles expressed in
 
 [Ray]
 
 even where the product was not mass-produced and the successor did not continue the identical product line.”
 

 Next, the trial court found that Miller transferred Its “drug-producing functions” to Smith while selling its good will, Milestrol trademark, and sales and distribution assets to SMP-NY; and that SMP-NY continued distribution of the drug subsequently manufactured by Smith, and of the “old stock” of Milestrol manufactured by Miller before Miller transferred manufacture of the product line to Smith.
 

 The trial court then bottomed its ruling as to the successor liability of SMP-NY (and derivatively of Cooper) by holding that “[distribution of the product, when combined with acquisition of good will, sales lists, sales personnel and product trademark, can support the imposition of successor liability.” Next, the court acknowledged the
 
 Ray
 
 prong of the product line theory, which requires a finding of “the virtual destruction of the [Phillips’] remedies against the original manufacturer
 
 caused by the successor’s acquisition of the business.” (Ray
 
 v.
 
 Alad Corp., supra,
 
 19 Cal.3d at p. 31, italics added.)
 

 However, as to that “virtual destruction of the [Phillipses’] remedies” prong of the
 
 Ray
 
 theory, the court simply made this finding: “[The Phillipses’] other remedies have been virtually destroyed, and . . . the successor to the product line contributed to the demise of the predecessor. . . .,” in that the transfer of the assets and good will of Miller to SMP-NY enabled SMP-NY to capitalize on Miller’s industry and reputation and continue distribution of the product line; and that “SMP-NY, by acquiring all of the old stock of the product line and the sales force and other distribution assets,
 
 used [Miller’s] resources to continue the distribution and in the process extinguished [the Phillipses’] remedies against [Miller] . . . .”
 
 (Italics added.)
 

 The lower court (and the Phillipses and Nestle) relied principally on
 
 Kaminski
 
 v.
 
 Western MacArthur Co.
 
 (1985) 175 Cal.App.3d 445 [220 Cal.Rptr. 895] in support of its ruling as thus rationalized.
 

 Kaminski
 
 was a case in which Western Asbestos Company (Western I), formed in the early 1900’s, was a Bay Area distributor of Johns-Manville
 
 *1647
 
 asbestos products in 1930 or 1932. In 1965, MacArthur Company (MacArthur) and Western I gave MacArthur complete operational control of Western I “without limitation.” This arrangement continued until 1967 when a new corporation, Western MacArthur Company (Western II), was formed to distribute the asbestos products. Western II took over or assumed all of Western I’s outstanding contracts, purchased Johns-Manville products from Western I and other noncash assets, and purchased Western I’s goodwill and customer mailing lists and records. The bulk of Western I’s employees stayed on as Western II employees. Western II represented to Western I customers it had and was using experienced personnel, products, engineering, and contracting services of Western I. Western I formally dissolved in 1969.
 

 Kaminski
 
 found Western II was liable to plaintiffs as the successor of Western I. It is evident
 
 Kaminski,
 
 unlike the instant case, was one in which the predecessor corporation (Western I) was completely taken over by a successor (MacArthur), that totally controlled its predecessor through the period of a management agreement as to which both corporations were parties. This control essentially continued through the offspring of the successor corporation, Western II, and was expressly asserted by Western II to those who had dealt with Western I. The predecessor corporation in
 
 Kaminski
 
 did not, as here, remain in business for 10 years, after disposing of part of its assets, at a greater profit than it formerly enjoyed. Instead, the predecessor corporation in
 
 Kaminski
 
 agreed in 1967 when the successor corporation was formed to cease business operations and to dissolve, such formal dissolution occurring in 1969.
 

 Although
 
 Kaminski
 
 imposed successor liability under
 
 Ray
 
 on a distributor of defective products, its holding does not, because of SMP-NY’s distribution of Miller’s products, compel a holding here of the successor liability of SMP-NY; i.e., it does not follow that the “virtual destruction” of the Phillipses’ remedies against Miller was caused by SMP-NY, simply because SMP-NY distributed some of Miller’s product for a time. As
 
 Kaminski
 
 observes: “Successor liability has generally been
 
 denied
 
 for a lack of causation in situations showing no contributory cause in the predecessor’s demise,
 
 such as when the predecessor sells product line assets but dissolves at a later date and for an independent reason.
 
 [Citations.]” (175 Cal.App.3d at p.458, italics added.)
 

 In order to impose liability upon a successor corporation, all three of the
 
 Ray
 
 prongs must be met.
 
 (Lundell
 
 v.
 
 Sidney Machine Tool Co.
 
 (1987) 190 Cal.App.3d 1546, 1556 [236 Cal.Rptr. 70].) Here, the first
 
 Ray
 
 criteron, “the virtual destruction of the [Phillipses’] remedies against the original manufacturer
 
 caused by the successor’s acquisition of the business,”
 
 
 *1648
 

 (Ray
 
 v.
 
 Alad Corp., supra,
 
 19 Cal.3d at p. 31, italics added) was simply not established by the evidence before the lower court.
 

 Nestle acquired Miller in 1958 when it obtained all of Miller’s stock. Nestle then reorganized Miller by transferring its drug production facilities to Smith and its inventory and sales force to SMP-NY.
 

 Miller then continued as a separate viable corporate entity fulfilling a warehousing function; and the record shows that Miller, until its dissolution 10 years later in 1968, was more profitable as a warehouse operation than it had been as a pharmaceutical operation, maintaining liability insurance from 1958 until its dissolution in 1968.
 

 Kline
 
 v.
 
 Johns-Manville
 
 (9th Cir. 1984) 745 F.2d 1217 is instructive here. In
 
 Kline,
 
 a corporation called Unarco manufactured an asbestos pipe insulation product called “Unibestos.” Unibestos was only one of hundreds of products manufactured by Unarco. In 1962, Unarco sold its entire Unibestos product line, including manufacturing facilities, customer lists, and the right to use the Unibestos trade name, to the Pittsburg-Corning Corporation (PCC). PCC continued to manufacture Unibestos until 1972. Plaintiffs in
 
 Kline
 
 filed their complaints in 1981, 1982, and 1983, alleging injuries sustained as a result of inhaling asbestos fibers during the installation and removal of Unibestos. In 1982, Unarco filed a petition for reorganization under the United States Bankruptcy Code. To sidestep the effect of the bankruptcy petition, the plaintiffs in
 
 Kline
 
 asked the court to impose liability on PCC for the injuries they suffered from the Unibestos manufactured by Unarco prior to the sale to PCC. The trial court refused to impose liability; and the appellate court affirmed, holding that an essential element for corporate successor liability under a
 
 Ray
 
 analysis, the destruction of plaintiffs’ remedies caused by the successor’s acquisition, was not present. In doing so, the court noted that, if there had been no sale of the Unibestos product line to PCC, the plaintiffs would not have been in any better position than they were at that time, for it was not the sale to PCC that caused Unarco to petition for reorganization.
 

 Here, as in
 
 Kline,
 
 Miller’s eventual dissolution was not caused by or even related to SMP-NY’s acquisition of Miller’s inventory or sales force in 1958. Indeed, Miller’s dissolution occurred some 10 years later, in 1968, when Miller’s sole shareholder, Nestle, voted to dissolve the corporation.
 

 The Phillipses and Nestle both dispute this conclusion. Relying principally on
 
 Kaminski, supra,
 
 175 Cal.App.3d 445, they claim that, in order to meet the causation requirement of
 
 Ray,
 
 there need only be a “causal connection” between the successor’s acquisition and the unavailability of the
 
 *1649
 
 predecessor as a potential defendant; and that the successor need only have “ ‘played some role in curtailing or destroying the [plaintiff’s] remedies.’ ”
 
 (Kaminski
 
 v.
 
 Western MacArthur Co., supra,
 
 175 Cal.App.3d at p. 458.) Thus, they argue, when SMP-NY acquired Miller’s finished products and sales force and Smith acquired Miller’s production facilities, Miller became merely a warehouse which reduced its ability to respond to plaintiffs in the event of a suit.
 

 However, in making this argument, the Phillipses and Nestle fail to explain how Miller’s reduction in operations reduced its ability to respond in the event of a suit, given, inter alia, its continued viable corporate status until 1968, its greater profitability as a warehouse operation, and its continued maintenance of liability insurance. The fact that Miller reduced or changed the scope of its operations after 1958 was not shown to affect its ability to compensate potential plaintiffs.
 

 Any curtailment of Miller’s potential liability to the Phillipses was not caused by SMP-NY’s acquisition of Miller’s inventory and sales force, but by the dissolution of Miller in 1968. No activity of SMP-NY caused the destruction of the Phillipses’ remedies against Miller or Miller’s dissolution, and there was no causal connection between SMP-NY’s acquisition of Miller’s sales force and inventory and Miller’s eventual dissolution 10 years later. Without such a connection, the trial court erred in tracing Miller’s liability to SMP-NY and eventually to Cooper; and successor liability of SMP-NY for acts of Miller must be denied because the dissolution of Miller, depriving the Phillipses’ of a remedy against Miller, was for a reason totally independent of any action or contributing cause of SMP-NY.
 
 [3]
 
 (175 Cal.App.3d at p.458.)
 

 
 *1650
 
 B.
 
 The Phillipses’ Cross-appeal
 

 The Phillipses cross-appeal from that portion of the trial court’s order which exonerated Nestle. They claim that, under the traditional theories of corporate successor liability stated in
 
 Ray,
 
 Nestle is responsible for their injuries because it expressly assumed the debts and liabilities of Miller, because Miller merged with Nestle, and because Nestle was a mere continuation of Miller.
 
 [4]
 
 We disagree.
 

 Nestle clearly never merged with Miller. The trial court so found, and the evidence amply supports this conclusion. Generally speaking, a merger is the absorption of one corporation by another which survives; retains its name and corporate identity together with the added capital, franchises, and powers of the merged corporation; and continues the combined business.
 
 (Heating Equipment Mfg. Co.
 
 v.
 
 Franchise Tax Board
 
 (1964) 228 Cal.App.2d 290, 302 [39 Cal.Rptr. 453].) The merged corporation ceases to exist, and the merging corporation alone survives.
 
 (Ibid.)
 
 Here, there was no merger because Miller continued to exist as a separate corporation for approximately 10 years after its stock was acquired by Nestle in 1958.
 

 For the same reason, Nestle’s acquisition of Miller’s stock did not result in a de facto merger. The Phillipses’ reliance on
 
 Marks
 
 v.
 
 Minnessota Mining & Manufacturing Co.
 
 (1986) 187 Cal.App.3d 1429 [232 Cal.Rptr. 594] does not change this conclusion. In
 
 Marks,
 
 the court discussed five factors which indicate whether a transaction cast in the form of an
 
 asset sale
 
 actually achieves the same practical result as a merger.
 
 (Id.
 
 at p. 1436.) Here, Nestle never purchased Miller’s assets. It only purchased Miller’s stock.
 
 Marks
 
 does not apply to the present transaction.
 

 Nor was Nestle a mere continuation of Miller. While Nestle and Miller had several common officers and directors, Miller continued as a separate corporation after its acquisition.
 

 Whether Nestle expressly assumed the liabilities of Miller is a more difficult question. While under traditional rules of corporate successor liability an acquiring corporation does not assume an acquired corporation’s liabilities when it purchases the acquired corporation’s stock, this would not prevent the acquiring corporation from voluntarily assuming the liabilities of the acquired corporation. For moral, ethical, or business rea
 
 *1651
 
 sons, the acquiring corporation may decide that it is in its best interest to expressly assume the liabilities of the acquired corporation.
 

 At trial, the Phillipses read into evidence Nestle’s answer to the following interrogatory: “Did the Nestle-LeMur Company assume the debts and liabilities of E. S. Miller Laboratories, Inc. at the time of acquisition or upon dissolution of E. S. Miller Laboratories, Inc.?” Nestle’s answer was a simple “Yes.” Nestle’s answer was verified by Harold Rand, the Chairman of the Board of Nestle, who was himself a lawyer in the State of New York.
 

 At trial, Rand explained Nestle’s answer to this interrogatory. He testified, “[M]y answer was, ‘Yes,’ which is the truth, but not the whole truth. [10 It should have said, ‘Yes, for known liabilities at the time of the dissolution.’ ”
 

 The Phillipses moved to strike Rand’s explanation of Nestle’s answer to the interrogatory. The court denied the motion. Following additional briefing on the issue, the court again denied the motion to strike.
 

 On appeal, the Phillipses challenge the court’s denial of their motion to strike. They claim the trial court abused its discretion when it permitted Rand to explain Nestle’s answer to the interrogatory, and that Nestle should have been bound by its initial answer. We disagree.
 

 The contradiction between an answer to an interrogatory and a witness’s testimony at trial does not in itself affect the latter’s admissibility.
 
 (Weiss
 
 v.
 
 Baba
 
 (1963) 218 Cal.App.2d 45; 48-50 [32 Cal.Rptr. 137];
 
 Castaline
 
 v.
 
 City of Los Angeles
 
 (1975) 47 Cal.App.3d 580, 591 [121 Cal.Rptr. 786]; see also
 
 Williams
 
 v.
 
 American Cas. Co.
 
 (1971) 6 Cal.3d 266, 275 [98 Cal.Rptr. 814, 491 P.2d 398].) Absent significant prejudice to the opponent, a party may present evidence at variance to prior answers to interrogatories.
 
 (Deyo
 
 v.
 
 Kilbourne
 
 (1978) 84 Cal.App.3d 771, 780, fn. 4 [149 Cal.Rptr. 499]; see also
 
 Singer
 
 v.
 
 Superior Court
 
 (1960) 54 Cal.2d 318, 325 [5 Cal.Rptr. 697, 353 P.2d 305].)
 

 Here, the Phillipses presented no evidence at trial showing how Rand’s explanation of Nestle’s answer to the interrogatory had prejudiced them. While supplemental briefing was apparently submitted to the court on the issue, it is not contained in the record on appeal.
 

 The intendments and presumptions are in favor of the trial court’s ruling on this question.
 
 (Walling
 
 v.
 
 Kimball
 
 (1941) 17 Cal.2d 364, 373 [110 P.2d 58].) On the record before us, absent a showing of prejudice, we
 
 *1652
 
 cannot say that the trial court abused its discretion in permitting Rand to explain Nestle’s answer to the interrogatory.
 

 Having reached this conclusion, we note the trial court found that Nestle did not assume Miller’s strict products liability by way of an express agreement. The Phillipses do not argue that this finding is not supported by the evidence.
 

 III. Disposition
 

 The order holding Cooper potentially liable for the Phillipses’ injuries as successor in interest to the corporate liabilities of Miller is reversed. The order exonerating Nestle is affirmed.
 

 Kline, P. J., and Smith, J., concurred.
 

 [1]
 

 At the time of Miller’s dissolution, former Corporations Code section 5000 was effective. That section did not require provision for claims that did not exist at the time a dissolution certificate was filed.
 
 (Ray
 
 v.
 
 Alad Corp.
 
 (1977) 19 Cal.3d 22, 31 [136 Cal.Rptr. 574, 560 P.2d 3].) Hence, Miller’s dissolution being proper, its shareholders were not liable for its debts, i.e., for future undisclosed liability claims. (See
 
 id.
 
 at p. 32;
 
 Potlatch Corp.
 
 v.
 
 Superior Court
 
 (1984) 154 Cal.App.3d 1144, 1151 [201 Cal.Rptr. 750].)
 

 [2]
 

 Cooper also argues that it cannot be held liable for the Phillipses’ injuries under traditional principles of corporate successor liability. We note that the trial court did not impose liability on Cooper on this ground, and no other party to this appeal has advanced any arguments in support of such a theory of liability. We see no grounds upon which liability could attach to Cooper based upon traditional principles of corporate successor liability.
 

 [3]
 

 We note that
 
 Brown
 
 v.
 
 Superior Court
 
 (1988) 44 Cal.3d 1049, 1069 [245 Cal.Rptr. 412, 751 P.2d 470] proscribes the strict liability of a manufacturer of prescription drugs for injuries caused by a design defect neither known nor knowable at the time the drug is distributed, and that such a manufacturer cannot be liable for failure to warn of such a defect. In
 
 Maloney
 
 v.
 
 American Pharmaceutical Co.
 
 (1988) 207 Cal.App.3d 282 [255 Cal.Rptr. 1], Division One of this court, after commenting on that proscription of
 
 Brown, supra,
 
 held that the product line theory of
 
 Ray, supra,
 
 is only applicable to product liability cases in which strict tort liability is available as a theory of recovery.
 
 Maloney
 
 expressly declined to extend the scope of Ray’s product line theory “beyond the strict liability arena.” (207 Cal.App.3d at pp. 289-290.) In
 
 Maloney,
 
 footnote 2 discusses the retroactive effect of
 
 Brown. (Id.
 
 at p. 287.) The knowledge of the alleged defects of Milestrol by its manufacturer was pleaded in this case, but not adjudicated in the bifurcated trial on successor liability. We express no view on the applicability of the
 
 Ray
 
 product line theory to this case under the restrictions
 
 of Maloney
 
 and
 
 Brown.
 
 We decide this case as to Cooper on the underlying inapplicability of
 
 Ray
 
 in establishing successor liability, because the record does not in our view support the trial court’s finding that SMP-NY was a causative factor in the “virtual destruction” of the Phillipses’ remedies against Miller.
 

 [4]
 

 Cooper also appears to argue that Nestle was responsible for the Phillipses’ injuries under an alter ego theory. It claims that Nestle exercised “total control of Miller.” However, as the trial court noted, the Phillipses neither pleaded this theory in their complaint nor argued for its application at trial.