Filed 9/25/18

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| NORTH VALLEY MALL, LLC, | C079281 |
| Plaintiff and Appellant, | (Super. Ct. No. 159283) |
| v. | |
| LONGS DRUG STORES CALIFORNIA, LLC, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Butte County, Stephen E. Benson, Judge. Affirmed.

Green & Hall, Howard D. Hall, Markus D. Self and Taylor R. Dalton for Plaintiff and Appellant.

Miller Starr Regalia, Thomas S. McConnell and Allison K. Wopschall for Defendants and Respondents.

At issue in this case is whether the court should "go behind" the form of a corporate reorganization in order to alter contractual obligations, when the corporation

1

utilized the type of reorganization it used in order to avoid altering its contractual obligations. The type of reorganization used in this case is a common one, and is referred to as a reverse triangular merger.[1] The usefulness of such a merger is to leave the target corporation intact as a subsidiary of the acquiring corporation where the target corporation has contracts or assets that are not easily assignable.

We conclude that where the form of reorganization was not chosen to disadvantage creditors or shareholders, we will not ignore the form of reorganization chosen by the corporation. We will affirm the judgment.[2]

FACTUAL AND PROCEDURAL BACKGROUND

In 1968, Longs Drug Stores, Inc. (Longs) and F. H. & C. Enterprises, Inc. (FHC) entered into two agreements. Pursuant to the first agreement, the construction agreement, Longs agreed to construct a drug store on property it had purchased from FHC and to continuously operate the building as a drug store for a period of 10 years. If Longs did not construct and operate the drug store for 10 years, or otherwise breached the terms of the construction agreement, FHC had the right to repurchase the property at cost less depreciation. The remainder of the property retained by FHC was improved with a shopping center, which was located adjacent to the property purchased by Longs.

The second agreement (Further Agreement) provided that Longs would pay FHC a proportionate share of the common area maintenance (CAM) fees for the shopping center, but that Long's proportionate share would be capped at one-fourth of 1 percent of

_____

[1] A reverse triangular merger is one in which an acquiring corporation forms a new subsidiary, which is merged into the surviving corporation. In this case a survivor corporation, North Valley Mall, LLC, merged with Longs Drug Stores, Inc., the surviving corporation, by sale of its stock but with retention of its legal title to the property at issue.

[2] North Valley Mall, LLC's request for judicial notice of the form 8-K filed with the United States Securities and Exchange Commission by Procter & Gamble Company is denied.

its gross sales.  However, if Longs sold or leased any portion of the property to a third party, that party's proportional share of the CAM fees would not be limited to a percentage of gross sales.

The disputed portions of the Further Agreement stated:

> "[Paragraph 12]  In the event LONGS shall sell or lease any portion of the subject property to any third person, such person shall be required to comply and LONGS agrees to provide in any contract for lease or other document by which such third person shall obtain the right to possession of such portion of the subject property that such occupant shall comply with all of the terms and provisions of paragraphs 10 and 11 in the same manner and to the same extent as LONGS, except, however, that the proportional share of such third person for common areas maintenance provided by paragraph 10 shall not be limited to one-fourth (1/4) percent of its gross annual sales.  [¶] . . . [¶]

> "[Paragraph 17]  In the event LONGS shall elect to sell or otherwise dispose of the subject property, it shall serve written notice thereof upon F.H.&C. and shall therein state the price and terms which it will entertain for such property.  F.H.&C. shall have sixty (60) days thereafter within which to elect to submit an offer consistent therewith or otherwise to negotiate with or reach agreement with LONGS for such purchase or other acquisition of the subject property."

Fast-forward 40 years to 2008.  North Valley Mall, LLC, (NVM) is FHC's successor in interest, and Longs has become the target of a reverse triangular merger, its parent company now being CVS Caremark Corporation (CVS).  NVM demanded that CVS pay additional CAM charges for 2009, citing the "transfer of Longs to CVS" as an event triggering the obligation to pay CAM charges without any cap.  CVS responded that Longs still owned the property, therefore its CAM obligations remained the same.  NVM not only continued to insist on additional CAM charges under the Further Agreement, it also insisted that the Further Agreement and construction agreement must

3

be read together, and breach of the Further Agreement entitled it to exercise its right under the construction agreement to repurchase the property at cost less depreciation.

Despite CVS's protestations, NVM continued to bill for the additional CAM charges, and eventually the additional CAM charges were paid for 2009-2011. CVS claims that these amounts were paid in error, and that it has demanded reimbursement.

NVM filed this action against Longs and CVS for breach of contract to recover the additional CAM charges for 2012, for specific performance to enforce its option under the construction agreement, and for declaratory relief to enforce the additional CAM charge provision and to enforce its option to repurchase the property.[3] Defendants cross-complained, seeking the return of the additional CAM charges they assert were overpaid.[4] The defendants moved for summary judgment on the complaint.

NVM did not substantially dispute defendants' statement of material facts. However, it disputed defendants' characterization of the Longs/CVS transaction as solely a stock acquisition. Although it could not dispute that Longs continued to hold title to the property, it maintained Longs was merely a shell entity for the sole purpose of holding legal title, and that CVS operated and controlled the property. NVM adduced evidence that the Longs stores have been renamed CVS, the Longs headquarters have been moved to CVS's headquarters, and all of Longs's executives and employees at the headquarters office were terminated or resigned after the merger.

The trial court granted the motion for summary judgment, holding that the acquisition did not transfer the real property owned by Longs because in a reverse triangular merger the ownership of the assets of the surviving corporation remain with the

---

[3] Following the merger, Longs became a limited liability company.

[4] The cross-complaint is not at issue in this appeal.

4

surviving corporation, Longs, after the merger. The trial court found that because there was no sale or lease of the property, the Further Agreement was not breached.

DISCUSSION

Corporations " 'have an identity apart from that of the owners.' " (*Kraft, Inc. v. County of Orange* (1990) 219 Cal.App.3d 1104, 1109.) Therefore, "the transfer of corporate stock is not deemed a transfer of the real property of a legal entity because the separate legal entity still owns the property." (*Ibid.*) However, a traditional merger--one in which two or more corporations merge, one survives and the others disappear--results in the transfer of the assets of each disappearing corporation to the surviving corporation. (2 Marsh's Cal. Corp. Law, (4th ed. 2013) Corporate Reorganizations § 19.10[C], p. 19-103; *Phillips v. Cooper Laboratories* (1989) 215 Cal.App.3d 1648, 1660.)

The transaction between CVS and Longs was a reverse triangular merger, sometimes referred to as a triangular phantom merger. This form of reorganization is used when the target corporation, in this case Longs, has licenses, permits, or property which is impossible or highly burdensome to attempt to transfer. (2 Marsh's Cal. Corp. Law, *supra*, § 19.01[H], p. 19-18.) In a reverse triangular merger, the acquiring corporation (CVS) forms a new subsidiary, which is merged into the target corporation (Longs) so that the target corporation is a surviving corporation that continues to own its assets. (*Ibid.*) Here, CVS acquired all of the issued and outstanding shares of Longs. To effectuate the stock acquisition, CVS formed a subsidiary called Blue MergerSub Corp., which merged with and into Longs, with Longs being the surviving corporation. Longs became a wholly owned subsidiary of CVS, and was converted to a limited liability

5

company named Longs Drug Stores, LLC.[5]  Longs remains vested with legal title to the property at issue.

## I

## There Was No Sale or Lease of the Property

NVM argues the trial court erred in granting summary judgment on its breach of contract and breach of the implied covenant of good faith and fair dealing claims.  Both causes of action are based upon defendants' failure to pay enhanced CAM charges.

NVM says there is a "dearth of authority" in California regarding the effect of a reverse triangular merger on the target company's pre-existing contractual obligations and duties.  NVM recognizes that courts usually describe reverse triangular mergers as similar to stock acquisitions because they do not work an assignment of contractual obligations from the target to the acquiring parent company, but argues this court should look to the de facto structure of the transaction to determine whether it was in fact a merger that transferred the property from Longs to CVS.  As evidence that a de facto merger occurred, NVM points to the fact that the Longs's headquarters was moved to CVS's headquarters, all Longs executives and employees in the headquarters office were let go or resigned, Longs became a limited liability company, the sign on the property was changed from Longs to CVS, CVS products are now sold at the property, and the store on the property now possesses an alcoholic beverage license in issued to Garfield Beach CVS LLC.

"[T]he intention of the parties as expressed in the contract is the source of contractual rights and duties.  A court must ascertain and give effect to this intention by determining what the parties meant by the words they used."  (*Pacific Gas & Elec. Co. v.*

---

[5]  Longs Drug Stores, Inc. changed its name in 1985 to Longs Drug Stores California, Inc.  In 2008 it converted to a limited liability company called Longs Drug Stores California, L.L.C.  We refer to all iterations of the company as Longs.

6

*G. W. Thomas Drayage & Rigging Co.* (1968) 69 Cal.2d 33, 38, fn. omitted.)  In this case, the plain language of the agreement specifies that the trigger for removing the CAM charge cap is the "s[ale] or lease [of] any portion of the subject property to any third person . . . ."[6]  When the agreement was made, Longs was a corporation.  A plaintiff who chooses to deal with a corporation must have known "that shares of stock therein might be owned by different stockholders and [are] subject to assignment to others in the ordinary course of business."  (*Ser-Bye Corp. v. C.P.&G. Markets, Inc.* (1947) 78 Cal.App.2d 915, 920, superseded by statute on another point, as stated in *In re Alberto* (2002) 102 Cal.App.4th 421, 430, fn. 4.)

As previously indicated, a sale or transfer of corporate stock, which undisputedly occurred here, is not a transfer of the real property because the corporate entity continues to own the property.  (*Kraft, Inc. v. County of Orange, supra*, 219 Cal.App.3d at p. 1109.)  The Further Agreement indicates that the parties intended the CAM cap to be lifted if the corporate real property was sold or leased.  We cannot interpret this language to include a sale of corporate stock.  NVM asks us to conclude that even if the property at issue was never sold or leased by Longs, we should look behind the reverse triangular merger and conclude that it was a de facto merger, resulting in the transfer of the property to CVS.  We decline to do so.

---

[6] NVM also stressed at oral argument that paragraph 17 of the Further Agreement, relating to FHC's right of first refusal, allowed FHC that right if Longs were to "sell or otherwise dispose of the subject property."  NVM argued that the change in possession and control that occurred as a result of the merger qualified as Longs "otherwise dispos[ing]" of the property.  However, paragraph 17 gave FHC the right to submit an offer in response to Longs's statement of the "price and terms" it would accept for the property in order to "purchase" or effect some "other acquisition" of the property.  Such language clearly anticipates a sale of the property or some other method of transferring title to the property, not just a change in the management and control of the store.

Reverse triangular mergers are a "well-recognized" method of reorganization that preserves the corporate entity of the target corporation. (*Kirschner Brothers Oil, Inc. v. Natomas Co.* (1986) 185 Cal.App.3d. 784, 791.) They are utilized in cases where the target corporation's assets are expensive or burdensome to transfer, or where transfer is prohibited. (3 Gutterman et al., Cal. Transactions Forms (2018) Business Entities, § 12:8.) Some courts have concluded that reverse triangular mergers do not effect a de facto merger unless they are structured to disadvantage creditors or shareholders. (*In re McKesson HBOC, Inc. Securities Litigation* (N.D. Cal. 2000) 126 F.Supp.2d 1248, 1277; *Binder v. Bristol-Myers Squibb, Co*. (N.D. Ill. 2001) 184 F.Supp.2d 762, 769-770.) There is no evidence this transaction was structured as a reverse triangular merger for either of these purposes.

It is undisputed that Longs never transferred title to the property, and continues to hold title to the property, although NVM argues Longs is merely a shell corporation that now exists solely for the purpose of holding title to the property. Nevertheless, we cannot ignore the fact that Longs has not sold or leased the property, which is the prerequisite under the Further Agreement to increased CAM charges. The reverse triangular merger was not performed for an improper purpose, and we are aware of no authority that would support finding a property transfer where there is none. If we were to label the transaction a de facto merger, the effect would be "to introduce intolerable uncertainty as to what procedures [are] required in connection with a reorganization transaction." (2 Marsh's Cal. Corp. Law, *supra*, § 19.01[B], p. 19-9.) We will not interfere with the reasonable economic expectations of the parties to these reorganizations where there is no effort to disadvantage creditors or shareholders.

We do not find NVM's argument that we should look to California tax law persuasive, either. Under Proposition 13 (Cal. Const., art. XIII A, added by initiative, Primary Elec. (June 6, 1978)), a transfer of ownership in corporate stock does not constitute a transfer of real property that will trigger a tax reassessment, unless a person

8

or entity "obtains control through direct or indirect ownership or control of more than 50 percent of the voting stock of any corporation, . . . through the purchase or transfer of corporate stock, . . . including any purchase or transfer of 50 percent or less of the ownership interest through which control or a majority ownership interest is obtained." (Rev. & Tax. Code, § 64, subd. (c)(1).)  We are not asked to rule on the tax ramifications of the reverse triangular merger, and if anything, the specification in the tax law that real property is deemed transferred upon the purchase or transfer of a certain percentage of voting stock indicates the Legislature was creating an exception to the general rule for the purpose of property taxes.

As we have concluded NVM was not entitled to increased CAM charges, it follows that Longs did not breach the Further Agreement, and NVM has no basis for claiming a right to repurchase the property under the construction agreement.

II

Payment Was Not a Waiver

NVM argues defendants waived their right to claim there was no sale or lease of the property by paying the increased CAM charges for 2009 through 2011.  Defendants claim the payments were made in error, but they cite no evidence to support this claim. Defendants also point out that the complaint sought charges for 2012 only, and those charges have been neither paid nor waived.  There is, however, a declaratory relief cause of action, which seeks prospective relief.  We make no judgment on NVM's waiver claim as to the increased CAM charges that have been paid.  We conclude that defendants' right to assert the lower CAM charges under the contract for 2012 and going forward were not waived.

We agree with defendants that their obligation to pay CAM charges under the further agreement is a continuing covenant, and that every failure constitutes a new potential breach.  (*Extension Oil Co. v. Richfield Oil Corp.* (1942) 52 Cal.App.2d 105, 108.)  Likewise, NVM's reciprocal obligation to provide maintenance at the contracted

9

amount of CAM charges was a continuing covenant, and every failure constituted a new breach.  Defendants have thus not waived their right to assert that they are being overcharged under the terms of the Further Agreement.

## DISPOSITION

The judgment is affirmed.  Defendants shall recover their costs on appeal.


/s/
Blease, Acting P. J.

We concur:


/s/
Hull, J.


/s/
Hoch, J.